UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
EAST END ERUV ASSOCIATION, INC., *et al.*,

                                        Plaintiffs,

                                                        MEMORANDUM AND ORDER
            -against-
                                                        CV 11-0213 (LDW) (ETB)
THE VILLAGE OF WESTHAMPTON BEACH, *et al.*,

                                        Defendants.
------------------------------------------------------------------X
Wexler, J.

        Plaintiffs East End Eruv Association, Inc. ("EEEA"), Marvin Tenzer ("Tenzer"), Morris

Tuchman ("Tuchman"), Clinton Greenbaum ("Greenbaum"), Alan Schechter, and Carol

Schechter bring this action against three groups of defendants:  (1) the Village of Westhampton

Beach ("Westhampton Beach"), Mayor Conrad Teller ("Teller"), and Trustees Toni-Jo Birk

("Birk"), Leola Farrell ("Farrell"), Joan S. Levan ("Levan"), and Hank Tucker ("Tucker") (the

"Westhampton Beach Defendants"); (2) the Village of Quogue ("Quogue"), Mayor Peter

Sartorius ("Sartorius"), and Trustees Randy Cardo ("Cardo"), Jeanette Obser ("Obser"),

Kimberley Payne ("Payne"), and Ted Necarsulmer ("Necarsulmer") (the "Quogue Defendants");

and (3) the Town of Southampton ("Southampton"), Supervisor Anna Throne-Holst ("Throne-

Holst"), and Council Members Nancy S. Graboski ("Graboski"), Christopher R. Nuzzi

("Nuzzi"), James W. Malone ("Malone"), and Bridget Fleming ("Fleming") (the "Southampton

Defendants"), alleging violations of the Free Exercise Clause and the Religious Land Use and

Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, and tortious

interference with contract.  Plaintiffs move for a preliminary injunction against all three groups

of defendants, each of which opposes the motion.  For the reasons below, the motion is denied as

against the Southampton Defendants and, based on that decision, is denied without prejudice as against the Quogue and Westhampton Beach Defendants.

## I.  BACKGROUND

For purposes of this decision, the relevant background can be summarized as follows:

A.  The Parties

EEEA was incorporated on March 9, 2010 as a Type B not-for-profit corporation pursuant to § 201 of the New York Not-for-Profit Corporation Law.  EEEA's members include plaintiffs Tenzer and Tuchman, and non-parties Jeffrey Lean ("Lean") and Deborah and Simcha Pollack.  Each of the individual plaintiffs resides in Westhampton Beach.  Jeffrey Lean is a resident of Quogue and has been so for 20 years.  The Pollacks reside in the unincorporated portion of Southampton, and they claim to have been personally harmed by Southampton's efforts to prevent the establishment of an eruv.  Deborah Pollack testified that she became a member after plaintiffs commenced this action (January 13, 2011) and filed their preliminary injunction motion (April 4, 2011).

Southampton is a municipal corporation organized under New York law and located in Suffolk County.  Supervisor Throne-Holst and Council Members Graboski, Nuzzi, Malone, and Fleming are members of Southampton's town board.

Westhampton Beach is an incorporated village located in Southampton.  Mayor Teller and Trustees Birk, Farrell, Levan, and Tucker are members of Westhampton Beach's board of trustees.

3

Quogue is an incorporated village located in Southampton.  Mayor Sartorius and Trustees Cardo, Obser, Payne, and Necarsulmer are members of Quogue's board of trustees.

B. <u>The Eruv</u>

According to plaintiffs, Jewish law prohibits carrying or pushing objects from the private domain, such as a home, to the public domain on the Sabbath.  Observant Jews believe that the presence of an "eruv" allows carrying and pushing within the eruv.  An eruv is an unbroken demarcation or delineation of an area.  An eruv may be established in a number of ways, including the attachment of wooden or plastic strips, called "lechis," to telephone or utility poles.

Plaintiffs propose to establish an eruv within the three defendant municipalities.  The perimeter, outline, or delineation of the proposed eruv would be the existing overhead utility wires, existing structures and natural boundaries.  Plaintiffs maintain that the eruv would significantly enhance their ability to practice their religion and would have no impact on non-Jews and non-observant Jews.  According to plaintiffs, without an eruv, they are forced to observe the Sabbath without families and friends, and they are deprived of the opportunity to participate in mandatory communal prayers and observances.  The eruv would allow them to carry ritual objects and personal belongings to the synagogue on the Sabbath.  For instance, Tuchman testified that, without an eruv, Jewish law prohibits him from carrying his keys, prayer shawl or prayer book to the synagogue on the Sabbath.

Plaintiffs maintain that an eruv would allow observant Jews who are forced to drive to the synagogue on the Sabbath to be more observant, allow children who are too young to walk to the synagogue to attend services, and allow their parents, who otherwise would have to stay at home to watch them, to attend.  For instance, Tuchman testified that, because there is no eruv, his

grandchildren leave Westhampton Beach on Fridays during the summer to return to their homes in Queens, New York, and they do not spend the Sabbath with him in Westhampton Beach.  In addition, Lean testified that he lives two and one-half miles from the synagogue and for the last five years has been unable to walk there due to an injury he suffered in an automobile accident. He testified that because of his disability he has special permission, from rabbis he consulted, to drive to the synagogue on the Sabbath, but an eruv would "improve [his] conscience" by allowing him to travel with his family to the synagogue in a wheelchair or other device.

Plaintiffs further maintain that safety and comfort are compromised in the absence of the eruv, as they are unable to carry identification and house or car keys to the synagogue on the Sabbath.  For instance, Deborah Pollack testified that, without an eruv, she cannot carry tissues or a bottle of water in hot weather on the Sabbath.

The boundary of plaintiffs' proposed eruv travels through each of the three defendant municipalities, forming a continuous, bounded area.  Plaintiffs first disclosed to defendants the geographical boundaries of the eruv when they filed their preliminary injunction motion.  Indeed, Southampton first learned of a potential eruv boundary within the unincorporated areas of Southampton when they received plaintiffs' motion, months after this action was commenced.  In prehearing statements, filed a few weeks before the hearing, plaintiffs disclosed to the defendants that they had changed the boundaries of the eruv, as well as the size and composition of the lechis.  The complaint described a smaller eruv with different and smaller lechis.  The newly proposed lechis were increased in length from 40 inches to up to 15 feet, and in composition from wood to PVC.  Plaintiffs explain that the change in the lechis was necessitated by Jewish law in view of the leaning and warping of the utility poles proposed to be used.  The change in

the eruv had the effect of changing the actual poles that would be used for attachment of the lechis, if not the number of poles, and testimony at the hearing failed to establish the exact location of the boundaries of the eruv.  Notably, there are 15,000 utility poles located in the three defendant municipalities.

C.  The Verizon and LIPA Agreements

Sometime in 2010, EEEA and Verizon entered into an agreement for the attachment of lechis to Verizon utility poles in the three defendant municipalities.  The proposed lechis were to be no longer than 40 inches.  However, as a result of the change in the proposed lechis, Verizon and EEEA executed a new agreement on June 13, 2011, two days before the hearing began on plaintiffs' motion (the "Second Verizon Agreement").  The Second Verizon agreement required EEEA to use PVC instead of wood for the lechis.  Under the Second Verizon Agreement, an application for a license is required to be submitted to and approved by Verizon before a lechi may be affixed to a Verizon pole.  The Southampton Defendants note that an undated "Application and Pole License" executed by EEEA, but not by Verizon, is annexed as Exhibit A to the Second Verizon Agreement.  However, Verizon Assistant General Counsel William Balcerski ("Balcerski") testified that he did not know if Exhibit A was part of the Second Verizon Agreement.  According to the Southampton Defendants, plaintiffs failed to show that they ever applied for such a license.

EEEA and LIPA entered into an agreement, dated July 27, 2010, for the attachment of lechis (the "LIPA Agreement).  The proposed lechis were to be no longer than 40 inches.  The Southampton Defendants note that Article VIII, Section 2 of the LIPA Agreement states that the "Agreement shall terminate six (6) months from the date hereof if the LICENSEE shall not have

applied for any license hereunder within that period." According to the Southampton Defendants, plaintiffs failed to show any license agreement for lechis up to 15 feet long and made of PVC or that they ever applied for a license within six months of July 27, 2010.

In submissions to the Court, Verizon and LIPA state that they have not issued licenses for the installation of lechis because the municipal defendants have contended that the attachment of lechis to utility poles either is not permitted at all or requires their prior approval pursuant to local laws, such as those regulating "signs," and the municipal defendants have "stated publicly that the installation of lechis would violate various local laws and have threatened to impose fines and/or to take other legal action against [Verizon] and LIPA if they permit the installation of lechis." Post-Hearing Statement by Verizon New York Inc. and Long Island Lighting Company d/b/a LIPA in Connection with Plaintiffs' Motion for the Issuance of a Preliminary Injunction ("Post-Hearing Statement by Verizon and LIPA") ¶ 8. As Verizon further explains, although the Second Verizon Agreement "refers to the possibility of municipal approval of the licensee's installation of items on its poles, [Verizon] does not require proof of municipal approval for all applications: it only requires proof of such approval in instances where approval is otherwise legitimately required under applicable law." *Id.* ¶ 9. As LIPA further explains, the LIPA Agreement "similarly requires the EEEA's compliance with applicable regulatory requirements, including local ordinances." *Id.* Both Verizon and LIPA note that they are plaintiffs in a separate action before this Court seeking a declaration confirming the legality of allowing the lechis to be installed without the municipal defendants' approvals, stating that "[i]f this Court issues the injunction requested by the EEEA, then [Verizon] and LIPA will issue licenses to the plaintiffs for the installation of lechis on their utility poles." *Id.*

In addition, under the Second Verizon Agreement, a pre-construction survey is required, as well as a "walk through" or "pole walk" to ensure that the lechis will be attached to the appropriate poles or the appropriate spots on the poles.  No pre-construction survey or walk through had occurred by the time of the hearing.  However, by post-hearing statement, Verizon and LIPA claim to have completed the "pre-construction survey and walk through required by [Verizon] and LIPA . . . on July 12, 2011."  Post-Hearing Statement by Verizon and LIPA ¶ 5.  In addition, by post-hearing declaration, Greenbaum claims to have participated in a "pole walk" with Verizon and LIPA representatives, after which Verizon's and LIPA's representatives allegedly "agreed to the designation of the utility poles on which the lechis will be placed." Declaration of Clinton Greenbaum Pursuant to 28 U.S.C. § 1746 in Support of Plaintiffs' Post-Hearing Reply Brief in Support of Their Motion for Preliminary Injunction ¶¶ 3-4.

D.  Southampton

Section 330-200 of Article XXII of the Town of Southampton Code (the "Town Code") contains Southampton's "Sign Ordinance," which became effective in November 2004.  The Sign Ordinance's stated purpose, in general, is to "promote the public health, safety and welfare through a comprehensive system of reasonable, effective, consistent, content-neutral, and nondiscriminatory sign standards and requirements."  Enactment of the Sign Ordinance followed a so-called "Southampton 1999 Comprehensive Plan Update" recommending, *inter alia*, that the "number of signs should be curtailed and such curtailment strictly enforced so as to avoid escalating clutter."  The ordinance defines a "sign" to include, *inter alia*, "[a]ny material, device or structure displaying or intending to display, one or more messages," as well as "any display of . . . [a]ny letter, numeral, figure, emblem, picture, outline, character, spectacle, delineation,

announcement, trademark, or logo."  Signs are prohibited in Southampton's public rights-of-way, including on telephone or utility poles located in those public rights of way.

A permit is required for all signs in Southampton, except for "exempt signs" identified in the Sign Ordinance.  An application for a permit must be made to Southampton's Building Department.  Section 330-210(E) of the Sign Ordinance provides for appeal of a permit denial to Southampton's Zoning Board of Appeals ("ZBA").  Indeed, if an applicant is denied a sign permit, Southampton provides instructions to be followed to apply for a variance.  In addition to the variance procedure at § 330-210(E), the Town Code provides that an aggrieved person who disagrees with the interpretation of the Town Code may appeal that determination to the ZBA.

The Southampton Defendants maintain that a lechi is a sign within the meaning of the Sign Ordinance, because it is a material, device or structure that demarks an area.  According to the Southampton Defendants, a delineation or outline does not need to convey a message in order to fall within the definition of a sign.  Nevertheless, the Southampton Defendants also argue that a lechi is a sign, in that it is an essential part of an eruv, and that an orthodox Jewish believer knowing the eruv exists would know that he or she is permitted to carry and push within it – hence, it sends a message.  Moreover, the Southampton Defendants argue that a lechi qualifies as an "emblem," because it is " 'something that is used to symbolize something else.' "  Reply Findings of Fact and Conclusions of Law on Behalf of Defendants the Town of Southampton *et al*., at 5 (quoting Merriam Webster Collegiate Dictionary 10th ed.).

Neither plaintiffs nor Verizon or LIPA submitted an application to Southampton for a permit to affix lechis to utility poles, applied for a variance, or appealed to the ZBA an

interpretation by any Southampton official that a lechi is a sign.  Indeed, plaintiffs did not review the procedures contained in the Sign Ordinance.

As for Southampton's enforcement of the Sign Ordinance, Mark Viscekas ("Viscekas"), an inspector in the Building Department, is assigned to administer and enforce the Sign Ordinance.  Michael Benincasa ("Benincasa"), the chief building inspector and head of the Building Department, is responsible for interpreting the Sign Ordinance.  Benincasa testified that if someone disagrees with his determination that something is a "sign" under the Sign Ordinance, a direct appeal can be taken to the ZBA of his interpretation.

According to the Southampton Defendants, Southampton has the right to remove illegal signs located in its public rights-of-way.  Notably, there are approximately 593 miles of public roads and, apparently, thousands of utility poles in Southampton (given the 15,000 utility poles located in the three defendant municipalities).  The Southampton Defendants contend that Southampton actively enforces the Sign Ordinance and employs a standard procedure when it is advised of the presence of an illegal sign, namely: log the complaint; phone or email the offending party; allow the offending party time to remove the sign; and remove the sign or issue an appearance ticket (if the sign is not timely removed).  Inspector Viscekas testified that he personally removes approximately 40 to 50 illegal signs per month.  He noted that the Building Department does not have equipment that can reach illegal signs that are located high on utility poles or just below the utility wires.  In such cases, it periodically contacts Southampton's Highway Department, which has the necessary equipment.

For the past 10 years, Southampton's police department also has been actively enforcing the Sign Ordinance.  The police do so by removing  signs that officers can reach while on patrol

and by contacting an offending person (if a phone number appears on the sign) regarding the illegal sign. Lieutenant Laurence Schurek ("Schurek"), chief of patrol, testified that he directs patrol sergeants verbally, by email, and at supervisors' meetings to enforce the Sign Ordinance. Lieutenant Schurek testified that he calls a supervisor or sector operator to remove illegally posted signs that he sees in Southampton, and that he personally removes illegal signs during his travels by pulling over on a safe shoulder of the road and pulling down signs with a hammer if he can reach them from the tailgate of his vehicle. On December 22, 2010, Lieutenant Schurek sent an email to all his squad supervisors reminding them of the sign removal policy they are to follow. He claims to have done so without knowledge of this lawsuit.

Plaintiffs produced photographs of six locations with signs on poles on Southampton's public roads, identified as Plaintiffs' Exhibits 31-40. In this respect, Greenbaum took pictures for plaintiffs from approximately September 2010 through June 2011. Plaintiffs produced no photographs of holiday decorations in Southampton.

In response, the Southampton Defendants explain that two of the six locations were areas where the signs depicted are very high and just below the utility wires. According to the Southampton Defendants, Plaintiffs' Exhibits 31-35 show signs which are up too high for Southampton's ordinary equipment. As demonstrated in Plaintiffs' Exhibit 35, the lower sign at the location depicted in Plaintiffs' Exhibit 34 was removed by Lieutenant Schurek before this lawsuit. Plaintiffs' Exhibits 34 and 35 ("WINTER'S COMING" sign at Montauk Highway and Mill Road), Plaintiffs' Exhibit 36 (sign at South Phillips Avenue and Montauk Highway), Plaintiffs' Exhibit 37 (sign at South Phillips Avenue and Montauk Highway), Plaintiffs' Exhibit 40 (sign at South Country Road and Club Lane), and Exhibits AA to Z of the Complaint (red

ribbon) were no longer at those locations by the time of the hearing.  Inspector Viscekas, upon learning of Plaintiffs' Exhibits 36 and 37 – through review of the exhibits exchanged in this case – removed those signs.  When Inspector Viscekas learned of the existence of Plaintiffs' Exhibit 35, he notified LIPA.  Regarding Plaintiffs' Exhibit 40, he verified through a town worker he sent to investigate that no sign was present at that location as of June 24, 2011 (a date in between hearing dates on plaintiffs' motion).

Former Town Attorney Michael Sordi ("Sordi") sent a letter, dated November 16, 2010, to Verizon's Balcerski regarding the eruv, stating:  "Based upon the definitions of our sign law, … I am compelled to conclude that the lechis constitute a 'sign' within the meaning and intendment of our Statute.  Accordingly, the same are prohibited."  Pls.' Exhibit 27.  Sordi also stated:  "Since you have indicated to me via telephone that your company was preparing to issue license agreements to permit the installation of lechis, I believe it incumbent upon my Office to advise you, in advance, that should the same be installed within the Town of Southampton, … it is our opinion that the same would be in contravention of our local laws which we shall endeavor to enforce lest they become meaningless."  *Id*.  Sordi noted that the Sign Ordinance provides for "various penalties," and asked Balcerski to confirm whether lechis would be located in the unincorporated areas of Southampton.

Balcerski testified that, at the time of Sordi's letter, he did not know whether the eruv was planned for the unincorporated areas of Southampton, and that he did not confirm the location as requested by Sordi.  Indeed, Southampton first confirmed that lechis and an eruv were proposed within the boundaries of the unincorporated areas of Southampton when they received plaintiffs' preliminary injunction motion.

Supervisor Throne-Holst emailed Greenbaum, as well as others in favor of or opposed to an eruv, acknowledging Town Attorney Sordi's statement that the eruv violated the Sign Ordinance, and stating that it was her duty to enforce the ordinance.

The testimony at the hearing did not discuss any actions by Graboski, Nuzzi, Malone or Fleming.

E.  Westhampton Beach

The Westhampton Beach Defendants concede that a lechi is not a "sign" under Westhampton Beach's sign ordinance and that the village does not have an application procedure that plaintiffs were required to follow.  Nevertheless, plaintiffs maintain that the Westhampton Beach Defendants have opposed and obstructed the eruv.  Plaintiffs rely on, *inter alia*, evidence that Teller, in campaigning for office in May 2008, and Tucker, in campaigning for reelection as a trustee in 2009, expressed their opinions opposing an eruv.  According to the testimony, sometime in 2008, before EEEA was formed, the Hampton Synagogue submitted an application to Westhampton Beach for a symbolic proclamation for the purpose of establishing an eruv.  At the time, Tuchman was president of the Hampton Synagogue.  That application apparently was withdrawn sometime later that year.  In any event, the village board wrote a letter to Verizon's Balcerski, dated May 18, 2009, stating:  "It's the Board's understanding that Verizon has again been discussing with the Hampton Synagogue an agreement . . . to create an 'eruv'. . . .  The Board further understands Verizon's position to be that it will not execute the proposed agreement … unless and until the Village approves the attachments."  Pls.' Ex. 10.  The Westhampton Beach Defendants maintain that Teller's and Tucker's personal opinions, expressed in campaigns for office, are not binding on the village or its board, and that the May

18, 2009 letter to Verizon does not indicate the village board's position regarding an eruv. Rather, they maintain that the village has not taken any action in opposition to plaintiffs' proposed eruv, and that the village board has neither discussed nor voted on it. Notwithstanding these assertions, the board obviously has taken action to retain counsel and oppose plaintiffs' motion.

F. Quogue

The Quogue Defendants maintain that plaintiffs and/or the utilities are required to obtain Quogue's permission to attach lechis to utility poles in its rights-of-way pursuant to Quogue Village Code §158. Section 158-1 provides: "No encroachment or projection upon, into or over any public road or street in the Village of Quogue shall be made or maintained." Section 158-2 defines an "encroachment" as "[a]ny private use of any portion of a public right-of-way through any structure or device, whether upon, above or under said right-of-way"; and a 'projection' as "[a]ny part of any building, structure or device erected upon private property or attached to any structure or device erected upon private property." The Quogue Defendants maintain that Quogue strictly enforces its regulations concerning its rights-of-way, offering evidence that Quogue does not allow any banners attached to utility poles; any seasonal or holiday decorations attached to utility poles; or signs for fairs, barbecues or other activities attached to utility poles. Mayor Sartorius testified that he first became aware that an eruv might touch parts of Quogue when he was so advised by Mayor Teller of Westhampton Beach in August 2010. Mayor Sartorius sent correspondence to Verizon and LIPA, advising the utilities of the applicability of the village's code provision and the need for village approval for the attachment of non-utility devices to utility poles in the village's rights-of-way.

Plaintiffs maintain that the Quogue Defendants have opposed and obstructed the eruv by their assertions that the code applies to the attachment of lechis to utility poles in the village and by threatening to impose fines and penalties should the utilities grant licenses.  Plaintiffs further maintain that the village code provisions do not apply because the attachment of lechis to utility poles are not encroachments or projections under the code.  As such, plaintiffs have not applied for permission to attach lechis to the public utility poles in the village's rights-of-way.  Plaintiffs maintain, nevertheless, that Quogue selectively enforces its code, purportedly as demonstrated by photographs taken by Greenbaum showing various items attached to poles in Quogue.  These photographs include (1) a utility pole bearing a sign depicting an advertisement for a volunteer fire department's "Pancake Breakfast" affixed to a pole at Montauk Avenue and Jessup Avenue on November 23, 2010; (2) a utility pole with several reflectors and numerals at 75 Dune Road on September 20, 2010; and (3) a utility pole bearing a splice box and metal conduit affixed by a utility company on Montauk Highway off Quogue Street on June 15, 2011.  Another sign, discussed by Mayor Sartorius at the hearing, was a public safety sign reading "School Open Drive Carefully," distributed by village police officers briefly for school openings.  However, plaintiffs do not explain how signs posted by the village police or a village department (such as the fire department) violate the village's own code, or how attachments placed on a utility pole by a "utility" company – such as a splice box and metal conduit – reflect selective enforcement by Quogue.

## II.  DISCUSSION

A.  The Southampton Defendants

The Southampton Defendants argue that plaintiffs' motion should be denied because (1) the action is not ripe; (2) plaintiffs have no standing; and (3) plaintiffs fail to make the showing required for a preliminary injunction.  As discussed below, even assuming that plaintiffs have standing, the Court agrees with the Southampton Defendants that this action is not ripe and that plaintiffs fail to show a likelihood of success on the merits – as required for a preliminary injunction.

1.  Ripeness

As the Second Circuit has recognized, "[r]ipeness is a doctrine rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005).  The "basic rationale" of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)).  "Determining whether a case is ripe generally requires [the court] to 'evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.' " *Id.* (quoting *Abbott Labs.*, 387 U.S. at 149).  The "fitness of issues for judicial review" requires "a weighing of the sensitivity of the issues presented and whether there exists a need for further factual development," whereas the "hardship to the parties" requires the court to "gauge the risk and severity of injury to a party that will result if the exercise of jurisdiction is declined."  *Id.*  Although the ripeness doctrine does not require " 'a futile gesture as a prerequisite for adjudication in federal court,' " *Desiderio v. Nat'l*

*Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir. 1999) (quoting *Williams v. Lambert*, 46 F.3d 1275, 1280 (2d Cir. 1995)), conclusory or unsupported allegations of futility will not suffice.  In a land use context, the so-called  "futility exception" is said to apply when the relevant "agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied."  *Murphy*, 402 F.3d at 349.

The Southampton Defendants argue that this action is not ripe because (1) neither plaintiffs nor the utilities applied for a permit or variance to attach the lechis to poles within the unincorporated areas of Southampton; (2) Southampton first learned of a potential eruv boundary within those areas of Southampton when it received plaintiffs' motion for a preliminary injunction; and (3) only during the preliminary injunction hearing did it learn that plaintiffs changed the size and composition of the lechis as well as the boundaries of the eruv.  Plaintiffs argue that this action is ripe because an application to Southampton would have been "futile," in that the "Town," through its "elected and appointed officials," has already "made clear that no application for an eruv ever would be granted."  Plaintiffs' Proposed Findings of Fact and Conclusions of Law Against Southampton Defendants, at 23-24.  Plaintiffs rely on former Town Attorney Sordi's letter to Verizon's Balcerski (advising that the Sign Ordinance prohibits attachment of lechis to poles within Southampton), and Supervisor Throne-Holst's email to Greenbaum (that allegedly "made clear" that Southampton opposed the establishment of the eruv).  *See id.*

The Court finds that this action is not ripe.  Under the circumstances, it appears that the Sign Ordinance is at least arguably applicable to the lechis, such that whether the Sign Ordinance applies to the attachment of lechis to utility poles in Southampton should be an issue for

Southampton to decide in the first instance.  In fact, testimony at the hearing left unclear the exact location of the boundaries of the eruv, and plaintiffs determined, only after the hearing, the location of the utility poles on which the lechis will be placed.  Plaintiffs have not sufficiently shown that resort to the permit and variance process is futile.  The town attorney's determination and the supervisor's email are not decisions of the "Town" on the issue, because enforcement of the Sign Ordinance lies with Southampton's Building Department and ZBA.  *Cf. Lost Trail LLC v. Town of Weston*, 289 Fed. Appx. 443, 445 (2d Cir. 2008) (developer's action against town, based on town attorney's alleged error in finding developer's recorded subdivisions legally ineffective under state law and in denying building permits, held not ripe for review, where town planning commission – not town attorney – was charged with implementing subdivision law; developer did not seek planning commission approval of subdivision plan or appeal denial of building permit to town's ZBA; and developer failed to show futility in seeking final municipal decision).  Indeed, plaintiffs apparently did not review the variance procedures contained in the Town Code, and they ignore the ZBA's authority to grant variances and decide appeals on the interpretation of Town Code provisions, under the Town Code and New York State Town Law, *see* N.Y. Town Law § 267-b.  New York's Town Law recognizes that a ZBA is a separate entity from a town board; in fact, a town board member is ineligible for membership on a ZBA.  *See* N.Y. Town Law § 267(2), (3).  On any appeal, the ZBA is obligated to " 'issue a decision in writing . . . linking its conclusions to evidence in the record.' "  *See Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 554 (S.D.N.Y. 2009) (quoting *Omnipoint Commc'ns, Inc. v. Planning & Zoning Comm'n of Wallingford*, 83 F. Supp. 2d 306, 309 (D. Conn. 2000)).  It is uncontested that plaintiffs never instituted any request for a variance or interpretation of a

Building Department determination.  Mindful that land use disputes are uniquely matters of local concern more aptly suited for local resolution, the Court concludes that Southampton should be given the opportunity to determine whether lechis of the size and composition now proposed by plaintiffs, within the newly proposed – and still unclear – boundaries of the eruv, are "signs" within the meaning of the Sign Ordinance.  *See Murphy*, 402 F.3d at 348, 353-54; *see also Adrian v. Town of Yorktown*, 341 Fed. Appx. 699, 700 (2d Cir. 2009) ("The finality prong of the ripeness test forces plaintiffs to 'obtain a final, definitive decision from local zoning authorities [and] ensure that . . . all non-constitutional avenues of resolution have been explored first, perhaps obviating the need for judicial entanglement in the constitutional disputes.' ").  The need for further factual development appears clearly to outweigh any risk of injury to plaintiffs from the court declining to exercise jurisdiction.  Accordingly, this action is not ripe as against the Southampton Defendants.

    2.  <u>Preliminary Injunction</u>

Generally, a party seeking a preliminary injunction must show that it will suffer irreparable harm absent injunctive relief and either (1) that it is likely to succeed on the merits of the action, or (2) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, provided that the balance of hardships tips decidedly in favor of the moving party.  *Mullins v. City of New York*, 626 F.3d 47, 52-53 (2d Cir. 2010); *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34-35 (2d Cir. 2010).  "However, when a party seeks an injunction that will affect governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the plaintiff must typically show a likelihood of success on the merits – a serious question going to the merits is usually insufficient,

even if the balance of hardships tips decidedly in the applicant's favor." *Mullins*, 626 F.3d at 53; *see also Charette v. Town of Oyster Bay*, 159 F.3d 749, 754 (2d Cir. 1998).

Even assuming that plaintiffs' action is ripe and that they have shown irreparable harm, the Court agrees with the Southampton Defendants that plaintiffs fail to show a likelihood of success on the merits on any of their claims.

a. Free Exercise Claim

In *Employment Division v. Smith*, 494 U.S. 872 (1990), the Supreme Court established the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice. *Id.* at 882 (holding Free Exercise Clause does not require state to exempt from neutral, generally applicable law prohibiting use of peyote its use during Native American religious ceremony); *see also Tenafly Eruv Ass'n v. Borough of Tenafly,* 309 F.3d 144, 165 (3d Cir. 2002) ("If a law is 'neutral' and 'generally applicable,' and burdens religious conduct only incidentally, the Free Exercise Clause offers no protection." (citing *Smith*, 494 U.S. at 879)). "[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Smith*, 494 U.S. at 879 (internal quotation marks omitted). *Smith* represented a significant change in the law of the Free Exercise Clause. As Dean Erwin Chemerinsky observes:

> For instance, prior to *Smith*, if a county had a law prohibiting all consumption of alcoholic beverages, there is no doubt that a free exercise exemption could have been obtained by a priest who wanted to use wine in communion or a Jewish family that wanted to use wine at a Sabbath or seder dinner. Yet, after *Smith*, it is

> clear that the priest or the Jewish family would lose in their free
> exercise claim.  The prohibition of the consumption of alcohol is a
> neutral law of general applicability; it applies to all in the county
> and was not motivated by a desire to interfere with religion.

Erwin Chemerinsky, *Constitutional Law, Principles and Policies* § 12.3.2.3, at 1259 (3d ed.

2006).  However,

> if the law is not neutral (*i.e.*, if it discriminates against religiously
> motivated conduct) or is not generally applicable (*i.e.*, if it
> proscribes particular conduct only or primarily when religiously
> motivated), strict scrutiny applies and the burden on religious
> conduct violates the Free Exercise Clause unless it is narrowly
> tailored to advance a compelling government interest.

*Tenafly Eruv Ass'n,* 309 F.3d at 165 (citing *Church of the Lukumi Babalu Aye, Inc. v. City of*

*Hialeah*, 508 U.S. 520, 532, 542 (1993)).  Thus, a neutral, generally applicable law is "subject

only to rational-basis review, which 'requires merely that the action be rationally related to a

legitimate government objective.' "  *Brown v. City of Pittsburgh*, 586 F.3d 263, 284 (3d Cir.

2009) (quoting *Tenafly Eruv Ass'n,* 309 F.3d at 165 n. 24).  Nevertheless, if a neutral and

generally applicable law is selectively enforced, strict scrutiny will be applied.  *Tenafly Eruv*

*Ass'n*, 309 F.3d at 165-66.

Here, Southampton's Sign Ordinance is neutral and of general applicability, and there is

no evidence indicating that discrimination played a part in its enactment.  Plaintiffs maintain,

however, that strict scrutiny applies because Southampton has selectively enforced the Sign

Ordinance against them to obstruct the eruv.  Relying on the Third Circuit's decision in *Tenafly*

*Eruv Ass'n*, plaintiffs argue that they are likely to succeed on the merits of their Free Exercise

claim because Southampton's actions cannot survive strict scrutiny.  On the other hand, the

Southampton Defendants maintain that Southampton vigorously enforces the Sign Ordinance and

that the record does not show selective enforcement.  As such, the Southampton Defendants argue that their actions need not be justified by a compelling government interest – even if such actions have the incidental effect of burdening plaintiffs' religious practice – and plaintiffs fail to show a likelihood of success under rational-basis review.  Thus, for purposes of this motion, the likelihood of success of plaintiffs' Free Exercise claim turns on plaintiffs proving selective enforcement.

The Court finds that the evidence does not sufficiently show that Southampton selectively enforces its Sign Ordinance, regardless of whether or not its enforcement can be characterized as "vigorous."  Plaintiffs' reliance on *Tenafly Eruv Ass'n* is misplaced.  In *Tenafly Eruv Ass'n*, the Borough of Tenafly ordered removal of lechis that were already attached to utility poles on borough property, purportedly because the lechis violated a borough ordinance prohibiting signs. However, the record showed that the borough "tacitly or expressly granted exemptions from the ordinance's unyielding language for various secular and religious – though never Orthodox Jewish – purposes" by permitting citizens to affix to utility poles "drab house numbers and lost animal signs to more obtrusive holiday displays, church directional signs, and orange ribbons." *Tenafly Eruv Ass'n*, 309 F.3d at 167.  The Third Circuit found that the lechis, apart from their religious nature, were comparable to those uses.  *Id.*  It concluded that the borough's selective, discretionary application of its ordinance violated the neutrality principle of the Free Exercise Clause.  *Id.* at 168.

Unlike the *Tenafly Eruv Ass'n* case, the evidence here does not demonstrate that the Town tacitly or expressly allowed exemptions, whether for religious or secular purposes, from the Sign Ordinance.  Significantly, plaintiffs presented only six locations with signs on the 593

miles of public roads and thousands of utility poles in Southampton, despite Greenbaum's two

years of photographing.  Yet it appears that in only two of the six locations did signs remain for

any appreciable length of time (Plaintiffs' Exhibits 31-35), and those signs were placed at heights

where Southampton explained the difficulty of removing them without special equipment.

Plaintiffs did not establish that the signs in the other four locations had been in place for any

significant length of time.  More importantly, the testimony of town officials reflects substantial,

active, and neutral enforcement of the Sign Ordinance, and Southampton's assurances that it

engages in good faith enforcement efforts in connection with illegal signs in the town is entitled

to some deference from this Court, *see Clear Channel Outdoor, Inc. v City of New York*, 594

F.3d 94, 111 (2d Cir. 2010).  By contrast, the Borough of Tenafly attempted to enforce an "often-

dormant" ordinance and did so in circumstances "sufficiently suggestive of discriminatory

intent."  *Tenafly Eruv Ass'n*, 309 F.3d at 168.  Plaintiffs presented no evidence of discriminatory

animus with respect to Southampton.

Because plaintiffs appear unlikely to prove that Southampton selectively enforced the

neutral, generally applicable Sign Ordinance against them, Southampton's enforcement is subject

to rational-basis review, *i.e.*, action that is rationally related to a legitimate government objective.

Given that plaintiffs fail to show a likelihood of success under rational-basis review, they fail to

show a likelihood of success on the merits on their Free Exercise claim.

b.  RLUIPA Claim

The Southampton Defendants argue, *inter alia*, that plaintiffs fail to show a likelihood of

success on their RLUIPA claim because they cannot show that they have a "property interest" in

any land, as required under RLUIPA.  The Court agrees.

Section 2000cc(a)(1) of RLUIPA provides:

> No government shall impose or implement a land use regulation in
> a manner that imposes a substantial burden on the religious
> exercise of a person, including a religious assembly or institution,
> unless the government demonstrates that imposition of the burden
> on that person, assembly or institution –
>> (A)  is in furtherance of a compelling governmental
>> interest; and
>> (B)  is the least restrictive means of furthering that
>> compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).  Section 2000cc-5(5) defines a "land use regulation" as

> a zoning or landmarking law, or the application of such a law, that
> limits or restricts a claimant's use or development of land
> (including a structure affixed to land), if the claimant has an
> ownership, leasehold, easement, servitude, or other property
> interest in the regulated land or a contract or option to acquire such
> an interest.

*Id.* § 2000cc-5(5).

Plaintiffs have not shown that they possess any "ownership, leasehold, easement,

servitude, or other property interest" in land or "a contract or option to acquire such an interest."

Indeed, Article II, Section 5 of the LIPA Agreement confirms that plaintiffs do not possess a

property interest:  "No use, regardless of its duration, of the LICENSOR'S poles under this

Agreement shall create or vest in the LICENSEE any ownership or property right in said poles,

but the LICENSEE'S rights therein shall remain a mere license."  As the Southampton

Defendants argue, the revocable "sub-licenses" offered by Verizon and LIPA to plaintiffs do not

rise, as a matter of law, to an interest in real property.  *See New York Tel. Co. v. Town of North

Hempstead*, 41 N.Y.2d 691, 699-700 (1977) (observing that "Telephone Company's right to erect

the poles under section 27 of the Transportation Corporations Law has been held to be a license or privilege, not the grant of an interest in or appurtenant to real property").

Accordingly, plaintiffs fail to show a likelihood of success on the merits on their RLUIPA claim.

### c.  Tortious Interference Claim

Under New York law, the elements of a tortious interference with contract claim are "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 726 F. Supp. 2d 291, 304 (S.D.N.Y. 2010).

Plaintiffs fail to show a likelihood of success on their tortious interference claim, as plaintiffs' evidence does not show any breach of the Second Verizon Agreement or LIPA Agreement caused by the Southampton Defendants, let alone that the Southampton Defendants' intentionally procured a breach without justification.

### B.  The Quogue and Westhampton Beach Defendants

As noted above, the boundary of plaintiffs' proposed eruv travels through each of the three defendant municipalities, forming a continuous, bounded area.  Consequently, the relief sought by plaintiffs against the Quogue and Westhampton Beach Defendants is interdependent upon the relief sought against the Southampton Defendants.  In other words, given the Court's denial of a preliminary injunction against the Southampton Defendants, even a grant of relief for plaintiffs as against the Quogue and Westhampton Beach Defendants will not allow the

construction of the proposed eruv.  Given these circumstances, the Court denies without prejudice plaintiffs' motion as against the Quogue and Westhampton Beach Defendants, and directs the parties to contact chambers to schedule a conference to discuss further proceedings in this action.

Nevertheless, the Court notes that the applicability of Quogue's sign ordinance (governing encroachments and projections on its rights-of-way) to the attachment of lechis to utility poles appears questionable.  Notwithstanding the questionable applicability of Quogue's code provisions, and that Westhampton Beach does not have an applicable sign ordinance or an application procedure that plaintiffs are required to follow, the Court suggests that plaintiffs propose a revised eruv plan to Quogue and Westhampton Beach for their consideration prior to any conference with the Court.

Accordingly, the Court denies without prejudice plaintiffs' motion as against the Quogue and Westhampton Beach Defendants.[1]

### III.  CONCLUSION

For the above reasons, plaintiffs' motion for a preliminary injunction is denied as against the Southampton Defendants, and is denied without prejudice as against the Quogue and Westhampton Beach Defendants.  The parties are directed to contact chambers to schedule a

---

[1]By motion, Jewish People for the Betterment of Westhampton Beach, Inc. seeks to intervene as a defendant in this action and then to participate in plaintiffs' motion for a preliminary injunction.  Given the Court's denial of the preliminary injunction motion, the motion to intervene is denied without prejudice.

conference to discuss further proceedings in this action.

     SO ORDERED.


_____/s/_____
LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
       November 3, 2011