SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
-----------------------------------------------------------x
EAST END ERUV ASSOCIATION, INC.,


                                    Petitioner,

For a Judgment Pursuant to Article 78                         Index No. 14-21124
of the Civil Practice Law                                     Date Filed: 10|24|14
and Rules,

           – against –

THE TOWN OF SOUTHAMPTON and THE                              **NOTICE OF PETITION**
TOWN OF SOUTHAMPTON ZONING
BOARD OF APPEALS,


                                    Respondents,

           and

VERIZON NEW YORK, INC. and LONG
ISLAND LIGHTING COMPANY d/b/a LIPA,

                            Additional Parties
                            Under CPLR § 1001
-----------------------------------------------------------x

**PLEASE TAKE NOTICE**, that upon the annexed Verified Petition of EAST END

ERUV ASSOCIATION, INC., and upon the proceedings had before Respondents TOWN OF

SOUTHAMPTON AND TOWN OF SOUTHAMPTON ZONING BOARD OF APPEALS, an

application will be made pursuant to CPLR Article 78, at an IAS Part of this Court, to be held in

and for the County of Suffolk, Supreme Court of the State of New York, at the Courthouse

located at One Court Street, Riverhead, New York, on the 24th day of November, 2014, at 9:30

o'clock in the forenoon of that day, or as soon thereafter as counsel can be heard, for a judgment pursuant to CPLR Article 78:

       1.     Annulling and setting aside the Respondent Town of Southampton Zoning Board of Appeals' (the "ZBA") determinations (a) denying Petitioner's appeal from the Southampton Chief Building Inspector's finding that lechis are signs under Southampton Town's Sign Ordinance (Town Code §§ 330-200 *et seq.*) as contrary to law, arbitrary and capricious, and in violation of Petitioner's and its members' constitutional right to the free exercise of their religion, (b) denying Petitioner's application for a variance as contrary to law, arbitrary and capricious, an abuse of discretion, and in violation of the Petitioner's and its members' constitutional right to the free exercise of their religion; and (c) failing to exercise its original jurisdiction to determine that the installation of lechis on utility poles owned by Verizon and LIPA was not prohibited by the Town Code;

       2.     Directing the ZBA to find that the lechis are not prohibited signs or, in the alternative, directing the ZBA to approve the variances sought by Petitioner;

       3.     Alternatively, determining that Southampton Town's Sign Ordinance (Town Code §§ 330-200 *et seq.*) does not prohibit installation of the lechis as sought by Petitioner;

       4.     Granting such further relief as this Court deems just and proper, including the costs and disbursements of this Proceeding pursuant to CPLR § 8101.

       **PLEASE TAKE FURTHER NOTICE**, that a Verified Answer and supporting papers, if any, together with a certified record of proceedings before the Respondent, must be served at least five (5) days before the return date of this Application pursuant to CPLR §§ 7804(c) and 7804(e), respectively.

Petitioner designates Suffolk County as the venue of trial pursuant to CPLR § 506(b).

The basis of the venue is that Respondents are located in Suffolk County.

Dated: Islandia, New York
      October 24, 2014

                    BRACKEN MARGOLIN BESUNDER LLP

                    By:  Linda U. Margolin
                    *Attorneys for Petitioner*
                    1050 Old Nichols Road, Suite 200
                    Islandia, New York 11749
                    (631) 234-8585

                    Robert G. Sugarman
                    Yehudah L. Buchweitz
                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York 10153
                    (212) 310-8000
                    *Co-Counsel for Petitioner*

TO:

Town of Southampton
116 Hampton Road
Southampton, NY 11968

Town of Southampton Zoning Board of Appeals
116 Hampton Road
Southampton, NY 11968

Verizon New York, Inc.
140 West St.
New York, NY, 10007

Long Island Power Authority, d/b/a/ LIPA
333 Earle Ovington Blvd.
Uniondale, NY 11553

3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
-------------------------------------------------------x
EAST END ERUV ASSOCIATION, INC.,


                                        Petitioner,

For a Judgment Pursuant to Article 78                    Index No. 14-21124
of the Civil Practice Law                                Date Filed: 10/24/14
and Rules,

              – against –

THE TOWN OF SOUTHAMPTON and THE                          **VERIFIED ARTICLE 78**
TOWN OF SOUTHAMPTON ZONING                               **PETITION**
BOARD OF APPEALS,


                                        Respondents,

                   and

VERIZON NEW YORK, INC. and LONG
ISLAND LIGHTING COMPANY d/b/a LIPA,

                          Additional Parties
                          Under CPLR § 1001
-------------------------------------------------------x
**TO:**  The Town of Southampton and the Town of Southampton Zoning Board of Appeals:

         The Petition of East End Eruv Association, Inc. ("EEEA"), by its attorneys, BRACKEN

MARGOLIN BESUNDER LLP, and WEIL, GOTSHAL & MANGES, LLP, respectfully shows

and alleges:

## PRELIMINARY STATEMENT

1.      This is a petition brought under Article 78 of the New York Civil Practice Law and Rules ("CPLR") to review the August 1, 2013 decision of the Town of Southampton Zoning Board of Appeals (the "ZBA") denying Petitioner's appeal of the Southampton's Chief Building Inspector's determination that a "lechi" is a "sign" pursuant to the Southampton Town Code, and denying requests for a variance for the placement of 28 lechis on 15 utility poles within Southampton, or to otherwise exercise its original jurisdiction in order to determine that the installation of lechis on utility poles was not prohibited by the zoning code.  Such ruling was arbitrary and capricious, applied the wrong legal standard, and is contrary to the evidence and unsupported by the evidence, and failed to provide reasonable accommodation to the free exercise of religion.

2.      Plaintiff-Petitioner EEEA is a not-for-profit corporation duly formed in 2010 under New York law, for the purpose of "coordinat[ing] efforts toward the promotion and construction of an eruv . . . in certain parts of Suffolk County, New York." EEEA's members include Marvin Tenzer, Deborah Pollack, and Simcha Pollack.

3.      For more than six years, Petitioner and certain Jewish residents of Suffolk County have sought to establish an eruv in parts of Southampton, as well as the Village of Westhampton Beach ("Westhampton Beach"), and parts of the Village of Quogue ("Quogue") (collectively, the "Municipalities") that would allow Jews with certain sincerely held religious beliefs to carry or push objects from place to place within a designated unbroken area during Sabbath and on Yom Kippur. There are hundreds of eruvin throughout the United States and scores in New York State alone, including in Nassau, Suffolk, and Westchester Counties.

4.      Petitioner entered into binding licensing agreements with Verizon New York, Inc. ("Verizon") and the Long Island Power Authority ("LIPA") in 2010 and 2011, which authorize

2

Verizon and LIPA to issue licenses to EEEA for the attachment of slim, 5/8-inch wide PVC strips known as "lechis" within the Town.  On June 16, 2014, the United States District Court for the Eastern District of New York determined that "nothing prohibits LIPA or Verizon from entering into contracts to facilitate the attachment of lechis to their utility poles in Westhampton Beach," and so Verizon and LIPA each issued licenses for the attachment of lechis to their respective poles in the Westhampton Beach.  Pursuant to these licenses, EEEA established an eruv in Westhampton Beach.

5.      All that is required for Petitioner to expand the eruv to Southampton is to attach a total of twenty-eight (28) lechis to fifteen (15) poles within the Town.

6.      However, at every opportunity, Respondents have unlawfully prevented Petitioner from establishing the eruv.  Beginning in 2010, Southampton took the insupportable and incorrect position in official written communications to Verizon and LIPA, as well as in its role as a defendant in the federal action *East End Eruv Ass'n, Inc.*, et al. *v. Vill. of Westhampton Beach*, et al., Case No. 11-cv-0213 (E.D.N.Y. filed Jan. 13, 2011) (the "Original EEEA Action") that local laws prohibit affixing lechis to utility poles, or that municipal approval is required for such action.  In the months leading up to the Original EEEA Action, Town representatives and officials (including the Town Supervisor) took the position in the press, public meetings, and correspondence with members of the public, that they opposed the establishment of an eruv.

7.      When Petitioner attempted to avail itself of Southampton's local administrative processes to obtain municipal approval for installing lechis, the Town threw up roadblock after roadblock in an effort to delay EEEA's application before issuing its inevitable denial.  When EEEA requested guidance from the Town as to the proper procedure for making a sign application to the Town, Southampton's officials and representatives provided contradictory

advice. When EEEA made reasonable and routine requests for a re-issuance of the Town's initial denial so it could appeal to the ZBA, the Town refused.  When EEEA submitted sign permit applications for each of the lechis to the Town Building Department, the applications were denied.  When EEEA thereafter appealed the denial to the ZBA in December of 2012, it was only to be met with serial dilatory tactics and discriminatory conduct by Respondents, leading to the ZBA's August 1, 2013 decision (attached hereto as Exhibit A), which denied all relief to EEEA.

8.      In making this determination, the ZBA acknowledged that various other signs are affixed to utility poles in Southampton – including a wooden cross that had been nailed to the base of a utility pole for at least a year – but arbitrarily and capriciously determined that these facts were not relevant.

9.      The ZBA determined that EEEA was time-barred from appealing the Chief Building Inspector's finding that lechis are signs.  However, the ZBA had an obligation to consider EEEA's application under its original as well as appellate jurisdiction, particularly given the governing case law dictating that zoning boards of appeals make reasonable accommodation to the free exercise of religious beliefs. The ZBA did not render any decision as to whether lechis fall within the definition of a "sign" under the Town Code.  The ZBA improperly ceded that interpretive authority to the Chief Building Inspector and adopted his interpretation without any independent analysis.

10.     The ZBA also found that the EEEA sought to "permanently affix signs to telephone poles in the public rights-of-way, which is specifically prohibited under the Town Code, regardless of the presence of the structure (i.e. the telephone pole-which is also specifically prohibited)," referring to Town Code § 330-210(A).  However, Section 330-210(A)

4

bans signs only if they are located in the "right-of-way lines of a public street." *See* Town Code § 330-210(A). There was no proof presented to or recited by the ZBA that the poles at issue were in the "right-of-way lines of a public street."

11. The ZBA further determined that the request for a variance should be denied because the lechis would "alter the essential character of the neighborhood." The ZBA also determined that the relief requested by the EEEA was "motivated by the personal desire of the applicant's members to be freed from the proscriptions of religious law by securing a variance of secular law (the Town's Sign Ordinance)." These findings were suffused with disparaging views of and constitute discriminatory animus against Petitioner's members and other Jews who share the same sincerely held beliefs.

12. Respondents' legally erroneous and arbitrary and capricious positions and determinations are entirely unsupported by local, state, or federal law, and constitute an interference with and deprivation of Petitioner's members' constitutional and civil rights to the free exercise of religion. New York State law, including as expressed in several cases from the Appellate Division, Second Department, requires the ZBA to reasonably accommodate free exercise.[1] Instead, the ZBA's ruling knowingly and intentionally interfered with that free exercise, refusing a minimal and reasonable accommodation.

---

[1] *See, e.g., Smith v. Cmty. Bd. No. 14*, 128 Misc. 2d 944 (Sup. Ct. Queens Cnty. 1985), *aff'd*, 133 A.D.2d 79 (2d Dep't 1987) (affirming the constitutionality of an eruv, and concluding that "New York Courts have long recognized the principle of accommodation" and they "have repeatedly held that by their very nature religious institutions are beneficial to public welfare and consequently proposed religious uses should be accommodated"); *see also Matter of Westchester Reform Temple v. Brown*, 22 N.Y.2d 488, 492-97 (1968) (reversing Planning Commission's rejection of synagogue's expansion plan, concluding that "under the guise of reasonable regulation, [the Planning Commission], has unconstitutionally abridged religious freedom"); *St. Thomas Malankara Orthodox Church, Inc., Long Island v. Bd. of Appeals, Town of Hempstead*, 23 A.D.3d 666, 666–67 (2d Dep't 2005) (zoning board's denial of church's application to waive certain off-street parking requirements was "arbitrary, capricious and an abuse of discretion and was properly annulled" because board was required to recommend other alternatives to "accommodate proposed religious use while mitigating adverse effects on surrounding community to the greatest extent possible"); *Richmond v. City of New Rochelle Bd. of Appeals on Zoning*, 24 A.D.3d 782,

13.     Accordingly, Petitioner seeks a judgment:  (a) annulling and setting aside the ZBA's determinations (i) denying Petitioner's appeal from the Southampton Chief Building Inspector's finding that lechis are signs under Southampton Town's Sign Ordinance (Town Code §§ 330-200 *et seq.*) as contrary to law, arbitrary and capricious, and in violation of Petitioner's and its members' constitutional right to the free exercise of their religion, (ii) denying Petitioner's application for a variance as contrary to law, arbitrary and capricious, an abuse of discretion, and in violation of Petitioner's and its members' constitutional right to free exercise of their religion; and (iii) failing to exercise its original jurisdiction to determine that the installation of lechis on utility poles owned by Verizon and LIPA was not prohibited by the Town Code; (b) directing the ZBA to find that the lechis are not prohibited signs or, in the alternative, directing the ZBA to approve the variances sought by Petitioner; (c) alternatively, determining that Southampton Town's Sign Ordinance (Town Code §§ 330-200 *et seq.*) does not prohibit installation of the lechis as sought by Petitioner; and (d) granting such further relief as this Court deems just and proper, including the costs and disbursements of this Proceeding pursuant to CPLR § 8101.

## PARTIES

14.     Petitioner EEEA is a not-for-profit corporation duly formed under New York law, with an address at 32 East 57th Street, New York, New York, 10022.  EEEA's members include

---

782–83 (2d Dep't 2005) (affirming grant of area variance, and holding that zoning board must make "every effort to accommodate [a] religious use" ); *Harrison Orthodox Minyan, Inc. v. Town Bd. of Harrison*, 159 A.D.2d 572, 572–73 (2d Dep't 1990) (a town board's unqualified denial of a special exception use permit was "arbitrary, capricious, and an abuse of discretion" where it did not make any attempts to accommodate religious use); *Matter of Jewish Reconstructionist Synagogue of the N. Shore, Inc. v. Levitan*, 41 A.D.2d 537, 538 (2d Dep't 1973) ("facilities for religious or educational uses are, by their very nature, clearly in furtherance of the public morals and general welfare; that different considerations apply to them; and that considerations which might properly control commercial structures may not control or even apply to religious structures") (citations omitted)).

Marvin Tenzer, Morris Tuchman, Jeffrey Lean, Deborah Pollack, Simcha Pollack, and Alan Schechter.

15.     Respondent Southampton is a town in Suffolk County, New York.

16.     Upon information and belief, Respondent ZBA is an instrumentality of the Town of Southampton authorized by the Town to review applications and to issue approvals under the Town Code.

17.     Additional party Verizon is a corporation organized under the laws of the State of New York with its principal office at 140 West Street, New York, NY 10007. Verizon provides telecommunications services in New York State, including Long Island, and is named herein as an additional party under CPLR § 1001 because it might be affected by a judgment herein. No relief is sought against Verizon.

18.     Additional party LIPA is a corporation organized under the laws of the State of New York. LIPA has its principal office at 333 Earle Ovington Blvd., Uniondale, NY 11510. LIPA owns and operates the electric transmission and distribution systems on Long Island, and is named herein as an additional party under CPLR § 1001 because it might be affected by a judgment herein. No relief is sought against LIPA.

## BACKGROUND

### I.     AN ERUV IS NECESSARY FOR PETITIONER'S MEMBERS FREELY TO EXERCISE THEIR RELIGION

19.     An eruv is a largely invisible unbroken demarcation of an area; eruvin (the plural of eruv) have existed under Jewish law for more than two thousand years. An eruv is created by, among other things, using existing telephone or utility poles and wires, existing boundaries, and strips of wood or plastic attached to the sides of certain of the poles ("lechis").

20.     The lechis proposed to be used in the eruv at issue are 5/8-inch half-round strips

7

of PVC plastic that would measure no more than ten to fifteen feet in length and would be affixed vertically to the poles. Each lechi could be painted so that it would blend in with the pole to which it is attached. A photograph of the type of lechi Petitioner seeks to use in the eruv is attached hereto as Exhibit B.

21.     Deborah Pollack and Simcha Pollack are individuals residing in Southampton and live one mile away from their synagogue in Westhampton Beach where they attend religious services on the Sabbath and religious holidays including Yom Kippur. Both are members of the EEEA. Both, like many Jews, have the sincerely held religious belief that, without an eruv, they are not permitted to push or carry objects outside their homes on the Sabbath and Yom Kippur.

22.     Both Deborah Pollack's elderly mother and Simcha Pollack's elderly father want to attend religious services when they visit at their children's home in Southampton. However, each is too weak to walk to the synagogue without a wheelchair. Because there is no eruv, the Pollacks cannot push their parents to synagogue. Deborah Pollack's mother's inability to attend synagogue on Yom Kippur is especially painful, as she cannot participate in the traditional memorial service for her late husband. Simcha Pollack cannot push his father to the synagogue in his wheelchair, and without the ability to attend a synagogue, his father—who is an ordained rabbi—refuses to spend the Sabbath or Yom Kippur with him. Deborah Pollack and Simcha Pollack are thus harmed by their inability to push wheelchairs on the Sabbath and Yom Kippur in the absence of an eruv.

23.     Other members of EEEA are harmed by the absence of an eruv because they have small children or grandchildren but cannot push baby carriages or strollers, or have relatives confined to wheelchairs. All members of EEEA and other Jews who share their sincerely held religious beliefs residing in Southampton are harmed by the absence of an eruv because without

8

one, they may not carry books, food, water, house keys, identification, prayer shawls, reading glasses, medicine, or other items to synagogue and other locations outside of their own homes on the Sabbath and Yom Kippur.

24.     A multitude of eruvin have been established nationwide and worldwide.  The first eruv in the United States was established in 1894 in the city of St. Louis, Missouri.  Since then, eruvin have multiplied across the United States, to the point where at least twenty-eight out of the fifty states now contain one or more municipalities with an eruv.  These include, among many others:  Huntington, Stony Brook, Patchogue, East Northport, Merrick, Mineola, North Bellmore, Plainview, Great Neck, Valley Stream, West Hempstead, Long Beach, Atlantic Beach, Lido Beach, Roslyn, Searingtown, Forest Hills, Kew Gardens, Belle Harbor, Holliswood, Jamaica Estates, New Rochelle, Scarsdale, White Plains, Albany, and Manhattan, New York.[2]

## II.     PETITIONER'S EFFORTS TO ESTABLISH THE ERUV HAVE BEEN INTENTIONALLY FRUSTRATED BY RESPONDENTS

25.     In 2010, EEEA members approached Verizon and LIPA and requested permission to affix lechis to utility and telephone poles owned by Verizon and LIPA in order to complete an eruv, which would encompass Westhampton Beach and parts of Southampton and Quogue.  This

---

[2] There are also eruvin in Cherry Hill, East Brunswick, Englewood, Fort Lee, Maplewood, Paramus, Passaic-Clifton, Rutherford, Teaneck, Edison, West Orange, Long Branch, Tenafly, and Ventnor, New Jersey; Bridgeport, Hartford, Norwalk, Stamford, New Haven, and Waterbury, Connecticut; Boston, Cambridge, Springfield, and Worcester, Massachusetts; Providence, Rhode Island; Berkeley, La Jolla, Long Beach, Los Angeles, Palo Alto, San Diego, and San Francisco, California; Pittsburgh, Philadelphia, and Lower Merion, Pennsylvania; Chicago, Buffalo Grove, Glenview-Northbrook, and Skokie, Illinois; Ann Arbor, Southfield, Oak Park, and West Bloomfield Township, Michigan; Baltimore, Potomac, and Silver Spring, Maryland; Charleston, South Carolina; Birmingham, Alabama; Atlanta, Georgia; Las Vegas, Nevada; Miami, Ft. Lauderdale, Boca Raton, Boyton Beach, Deerfield Beach, Delray Beach, and Jacksonville, Florida; Denver, Colorado; Cleveland, Cincinnati, and Columbus, Ohio; Portland, Oregon; Memphis and Nashville, Tennessee; New Orleans, Louisiana; Dallas, Houston, and San Antonio, Texas; Richmond, Virginia; Seattle, Washington; Phoenix, Arizona; and Washington, D.C.  Most recently, eruvin have been established in Plano and Austin, Texas; Scottsdale, Chandler and Tempe, Arizona; and Omaha, Nebraska

WEIL:\95134239\1\99910.3414

approach was undertaken after research revealed that no local, county, or state law or ordinance prohibits such action.  Verizon and LIPA agreed to grant permission.

26.     In or about May 2010, EEEA and Verizon entered into an Eruv-Lechi Stave Agreement.  In this agreement, which was fully executed on August 16, 2010, Verizon agreed to allow EEEA to affix lechis to Verizon's poles to complete an eruv.

27.     On or about July 27, 2010, EEEA and LIPA entered into a License Agreement, whereby LIPA agreed to allow EEEA to affix lechis to LIPA's poles to complete an eruv.

28.     After entering into these agreements with Verizon and LIPA, Petitioner determined through their rabbinical sources that the attachment of longer lechis than they had originally anticipated would be necessary.  Verizon agreed but required the longer lechis to be made of 5/8-inch PVC plastic.  On or about June 13, 2011, EEEA and Verizon entered into an updated Pole Attachment Agreement For Miscellaneous Attachments which provided for the attachment of 5/8-inch half-round PVC lechis to Verizon's utility poles.

29.     On July 12, 2011, representatives of EEEA, Verizon, and LIPA conducted a "pole walk," pursuant to EEEA's respective license agreements with Verizon and LIPA, to identify those poles on which EEEA would attach lechis.

**III.     SOUTHAMPTON GOVERNMENT OFFICIALS' INTERFERENCE.**

30.     At or around the time of the execution of EEEA's agreements with Verizon and LIPA, officials in Southampton sought actively to interfere with and obstruct EEEA's ability to construct the eruv.

31.     On November 16, 2010, Southampton Town Attorney Michael C. Sordi wrote a letter to Verizon counsel William Balcerski copying LIPA counsel Michele Pincus, Quogue Mayor Peter S. Sartorius, Westhampton Beach Mayor Conrad Teller, and EEEA, advising him of the Town's position that the proposed eruv would be "in contravention of our local laws" (the

10

"Sordi Letter"). The position taken in the Sordi Letter singled out the lechis as distinguished from all of the non-commercial and commercial attachments to utility poles that the Town has either sanctioned with "no objection" letters, or has benignly ignored.

32.     According to Southampton's elected representatives, the Town's Sign Ordinance (Town Code § 330-200 *et seq.*) is designed to protect public health and safety and to facilitate efficient traffic flow. Yet no representative of Southampton has been able to show how lechis would endanger public health and safety or traffic flow, other than to say the ordinance is meant to ensure "quality of life."

33.     The Sign Ordinance, on its face, is inapplicable to the lechis in question and, in any event, is not enforced with any consistency or regularity. Indeed, signs and objects that are larger and more visible than the lechis have been explicitly sanctioned or allowed to remain throughout Southampton. For example, Original EEEA Action plaintiff Clinton Greenbaum took several photographs of utility poles in Southampton that depict items attached to the poles that would, under the Southampton's definition, qualify as signs.

34.     In addition, the fifteen poles to which Petitioner seeks to attach lechis have various items on them, including plastic material indistinguishable from, and in many cases, larger than, lechis, a Yard Sale sign and a wooden cross (surrounded by two stones) nailed to the base of pole no. 22-40-P (one of) on Summit Blvd. south of Park Street in Southampton.[3] *See* Southampton Pole Photos, attached hereto as Exhibit C.

_____

[3] On August 13 and 14, 2013, Mr. Greenbaum returned to pole no. 22-40-P and saw that the wooden cross had been removed from the front of the pole (leaving behind the outline of a cross), only to have been moved to the back side of the pole, so that it was no longer visible to passersby from the street. However, on June 9, 2014, Mr. Greenbaum returned to pole no. 22-40-P and saw that the wooden cross had again been placed at the front of the pole.

35.     Throughout the process culminating in the ZBA's decision, Southampton's behavior has stood in stark contrast to that of the many other municipalities throughout the United States that have not only permitted the establishment of eruvin, but also encouraged and offered assistance to facilitate their construction.

36.     On November 3, 2011, the Federal District Court issued an order in the Original EEEA Action, holding that "Southampton should be given the opportunity to determine whether lechis of the size and composition now proposed by plaintiffs . . . are 'signs' within the meaning of Southampton's ordinance governing signs within the Town."

37.     Between February and April 2012, EEEA's counsel consulted with the Chief Building Inspector and Southampton's litigation counsel regarding the process EEEA would have to follow in order to obtain such a determination.

38.     Southampton's outside counsel memorialized the Town's position regarding the process in a letter to EEEA counsel dated April 13, 2012, a true and correct copy of which is attached hereto as exhibit G to Exhibit E.  This letter directed that "a letter request to [the Chief Building Inspector] is necessary," and that "[i]n the event the building inspector determines that a lechi is a sign, a sign application must be filed" with the Town Building Department.  Ex. G to Ex. E, at 1.  The letter further stated that"[i]n the event [EEEA] will be seeking to appeal the building inspector's [adverse] determination and seeking a variance from the Sign Law, such timely applications may be submitted simultaneously to the Zoning Board of Appeals."  *Id.*

39.     EEEA Counsel thereafter prepared and sent a letter to the Chief Building Inspector as directed by Southampton's outside counsel, dated April 17, 2012 (attached hereto as exhibit H to Exhibit E) requesting an interpretation that lechis do not constitute "signs" within the meaning of the Sign Ordinance.  Ex. H to Ex. E, at 1.

12

40.     On April 25, 2012, the Town's outside litigation counsel advised in an e-mail to EEEA Counsel: ". . . Southampton's procedures will not require you to make a sign application prior to seeking a variance. So you should just focus on the questions you have with respect to a variance application and an application to appeal an interpretation."

41.     On April 27, 2012, the Chief Building Inspector, Mr. Benincasa, sent EEEA Counsel a letter via e-mail, attached hereto as exhibit C to Exhibit E (the "Interpretation Letter"). The Interpretation Letter stated that a lechi was a "sign" within the meaning of the Sign Ordinance because it "is a material, devise [*sic*] or structure displaying or intending to display a message," and because "[l]echis and the Eruvim [*sic*] of which they are part are outlines, delineations or emblems." Ex. C. to Ex. E at 1. The Interpretation Letter concluded that, "[a]s set forth in Town Code §330-165, this interpretation is subject to an appeal to the Zoning Board of Appeals," and that "[t]he application is available on the Town of Southampton website." *Id.* at 3.

42.     The Interpretation Letter did not refer to any definitional section of the Town Code. The Interpretation Letter stated that EEEA could appeal pursuant to Section 330-165 of the Town Code, but failed to advise that the ZBA had original jurisdiction pursuant to Town Code Sections 330-166(A) and 330-210(E) to vary or modify the application of the zoning code, including the Sign Ordinance.

43.     On April 30, 2012, the Town's outside litigation counsel and Mr. Benincasa verbally advised EEEA Counsel that EEEA must submit an appeal from the Interpretation Letter. They advised that the only recourse for EEEA was to submit a variance application to the ZBA at the time it filed its appeal. They confirmed that the interpretation appeal and the variance application could be submitted simultaneously to the ZBA, and that the filing of either item

WEIL:\95134239\1\99910.3414

would result in the setting of a hearing date on the ZBA's calendar, at which both items would be considered.

44.     In a letter to EEEA Counsel dated May 8, 2012, a true and correct copy of which is attached hereto as exhibit I to Exhibit E, Southampton Counsel elaborated on the process the Town believed EEEA should follow in order to seek relief from the Board.  Southampton Counsel's letter stated that "consistent with Southampton ZBA practice, an appeal of [the Chief Building Inspector's] interpretation dated April 27, 2012 and the alternative application for a variance from the Sign Law may be brought simultaneously."  Ex. I to Ex. E at 1.  The letter also asserted that "it is not necessary that [EEEA] file a sign application prior to the ZBA application for a variance from the Sign Law," and that the type of variance to be requested from the Board was a "use variance."  *See id.*

45.     On Friday, June 29, 2012, the Town's outside litigation counsel filed a letter with the Court in the Original EEEA Action, claiming that EEEA was time barred from submitting an interpretation appeal and variance application because it had not filed an appeal with the ZBA within sixty days of April 27, 2012, the date that the Chief Building Inspector e-mailed the Interpretation Letter to EEEA Counsel.

46.     On July 19, 2012, EEEA's additional counsel wrote a letter to the Chief Building Inspector, a true and correct copy of which is attached hereto as exhibit J to Exhibit E (the "July 19 Letter"), requesting that the Chief Building Inspector reconsider the opinion set forth in his Interpretation Letter that lechis are not "signs" subject to regulation by the Sign Ordinance, or alternatively determine that a lechi "is either a non-regulated or exempt sign" under the Sign Ordinance.  *See* Ex. J to Ex. E, at 3.  EEEA's counsel further noted that his letter could be considered one of "intent" for the placement of lechis on the utility poles in question.  *See id.*

14

47.     EEEA never received a response.  On July 30, 2012, the Town Attorney sent EEEA's counsel a letter, attached hereto as exhibit B to Exhibit E (the "Town Attorney Letter") in which she asserted that any review of the Interpretation Letter "would have been made pursuant to Southampton Town Code §330-165 by way of an appeal to the Southampton Zoning Board of Appeals," and that because no appeal had yet been taken, "there is no 're-examination' [of the Interpretation Letter] available pursuant to the Southampton Town Code, New York State Town Law, or otherwise." *Id.*

48.     After receiving the Town Attorney Letter, EEEA learned that the administrative procedure outlined by Southampton's litigation counsel and the Chief Building Inspector in April and May of 2012 was incorrect.  EEEA had not applied for a sign permit in connection with the lechis in reliance on the advice of Southampton's litigation counsel and the Chief Building Inspector in the May 8, 2012 letter from Southampton Counsel to EEEA Counsel —which specifically asserted that EEEA need not file a sign permit application with the Town Building Department as a prerequisite to obtaining ZBA review.

49.     EEEA thereafter prepared and filed twenty-eight (28) sign permit applications— one for each proposed lechi—with the Town Building Department on September 14, 2012.  By letter dated October 25, 2012, attached hereto as exhibit A to Exhibit E, the Senior Building Inspector, on behalf of the Chief Building Inspector, denied the Sign Permit Applications, stating that "the applications for sign permits are hereby denied as Southampton Town Code § 330-203(B)(10), prohibits the placement of a sign on a telephone pole." *See* Ex. A to Ex. E, at 1.  The October 25 letter further advised EEEA that it "must obtain use variances from the Zoning Board of Appeals to install a sign on these utility poles." *Id.* at 2.

50.     The Town's denial of the sign permits specifically relied on Section 330-203(B)(10) of the Town Code, citing that it "prohibits the placement of a sign on a telephone pole." *See* Town Code § 330-203(B)(10). However, the language of this subsection actually prohibits "[t]emporary or permanent signs resting on, attached to or inside any vehicles, buildings, fences, telephone poles or any other structures or means of support or otherwise displayed in any manner designed to circumvent the restrictions in this article." *Id.* There was no explanation of what restriction the lechis were designed to circumvent.

51.     On September 28, 2012, EEEA also submitted an appeal from the Town Attorney's July 30, 2012 denial letter (attached hereto as Exhibit D), to preserve EEEA's right to appeal to the ZBA before sixty days elapsed.

## IV.     EEEA APPEALS THE ADVERSE DETERMINATIONS FROM THE TOWN BUILDING DEPARTMENT AND TOWN ATTORNEY'S OFFICE TO THE ZBA, AND APPLIES FOR VARIANCES FOR THE LECHIS

52.     On December 4, 2012, EEEA appealed the Town's denial of the Sign Permit Applications and the Town's determination that lechis qualify as "signs" within the meaning of the Sign Ordinance.[4] *See* December 4, 2012 letter from EEEA's Counsel to Kandice Cowell of the ZBA attaching appeal application, attached hereto as Exhibit E. In the alternative, the appeal requested "that the Board grant EEEA area and/or use variances, permitting the attachment of lechis to the utility poles in question located within the Town." *Id.* at pg. 2 of the Appeal and Application for Variance.

53.     Pursuant to Southampton Town Code § 330-164H and multiple communications with Assistant Town Attorney Kathryn Garvin, counsel for the ZBA, between February and March of 2013, EEEA published notice of its appeal and variance application well in advance of

---

[4] This appeal supplemented the earlier, timely-made appeal that was submitted on September 28, 2012.

the April 4, 2013 hearing. First, EEEA published a notice of hearing in *The Southampton Press* on March 21, 2013. EEEA also re-published the same notice of the hearing in *The Southampton Press* on March 28, 2013. Second, as instructed by Ms. Garvin, EEEA posted a sign containing notice of the hearing on the property of Petitioner and EEEA members Simcha and Deborah Pollack within the unincorporated area of the Town. Finally, EEEA mailed notice of the public hearing to all property owners whose parcels abutted one or more of the utility poles to which EEEA seeks to attach lechis for the purpose of creating the eruv.

54.    On March 29, 2013, EEEA submitted a memorandum of law to the ZBA setting forth the relevant issues. The memorandum articulated the legal basis for why lechis are not "signs" within the meaning of the Sign Ordinance, including that "[t]he twenty-eight (28) 5/8-inch PVC strips that EEEA seeks to affix[ ] to fifteen (15) of Verizon's and LIPA's poles in the Town do not display, nor do they intend to display, any message." *See* Memorandum of Law in Support of East End Eruv Association, Inc.'s Appeal and Application for Variances, at 9. Since the Town Code's definition of "sign" includes the requirement that it be "used for the purpose of bringing [a] message[ ] to the attention of the public," the proposed lechis cannot be considered signs because "[t]he general public will not only be unaware as to the existence of the lechis, but will also likely be unable to locate this nearly invisible object on the utility poles." The memorandum further explained that the lechis do not fall within any of the other definitions of "sign" in the Sign Ordinance because (1) the lechis do not consist of "any letter, number, figure, emblem, picture, outline, character, spectacle, delineation, announcement, trademark, or logo," and (2) are not in any way used for "the purpose of commercial identification." Additionally, "[a] lechi cannot be considered an "outline" or "delineation" because it does not outline or delineate anything; rather, the outline or delineation of the proposed eruv would be the existing

17

overhead utility wires, existing structures, and preexisting natural boundaries, not the lechis. Finally, EEEA submitted, in the alternative, "that if the Board determines that lechis are 'signs' that are subject to regulation by the Sign Ordinance, they should nonetheless be exempted from the ban on prohibited signs in Section 330-203(B) of the Southampton Town Code," or EEEA should be granted an area and/or use variance.

55.     On April 4, 2013, the ZBA held a public hearing to address: (1) whether lechis are "signs" subject to regulation under the Southampton Town Ordinance; (2) whether, irrespective of whether the lechis are "signs," they should be treated as exempt or unregulated signs within the meaning of the Southampton Town Ordinance; and (3) whether, alternatively, EEEA should be granted an area or use variance.

56.     The first question before the ZBA was the proper interpretation of the Southampton Sign Ordinance and EEEA's ability to place lechis on the utility poles. EEEA's counsel explained that it was "seeking the [B]oard's interpretive authority, and . . . would respectfully argue that the lechis shouldn't even be considered a sign and we shouldn't even be here. . . . But in the alternative, if we advance the legal analysis that it is considered a sign, [EEEA] would advance the argument that it's either an exempt sign or one that is not regulated." EEEA's counsel further explained that a lechi does not outline or delineate a boundary; that the affixation of the lechis is necessary for, and is the least intrusive means of, creating the eruv; and that, as a matter of law, courts should not involve themselves in the interpretation of religious law.

57.     John Breslin, a local real estate expert, testified on behalf of EEEA that the variance standards were met, entitling EEEA to variances, because there would be no adverse effect on neighboring property values resulting from the installation of the 28 lechis.

18

58.     EEEA President Tenzer addressed the severe impact that the absence of an eruv in the Westhampton area has had on his life.  Mr. Tenzer also explained that the lechis do not send any sort of message to the public—"not for Orthodox Jewish public, not for any public. . . . 99 percent of the congregation has no idea whether it's up or down unless they are told, on Friday afternoon, it's up."

59.     Jonathan Sinnreich, counsel for the Jewish People Opposed to the Eruv ("JPOE") also testified in opposition to EEEA's application claiming that an eruv as a whole is a sign—an issue not before the ZBA.

60.     Several non-Petitioner individuals who supported EEEA's appeal and application also spoke and enumerated the various ways in which not having an eruv has hindered their family life and the practice of their religion.

61.     The ZBA continued the public hearing to June 6, 2013 and ordered a deadline of 4:00pm on May 17, 2013 for written submissions from counsel.  Ms. Nowak had stated during the April 4, 2013 meeting that the lechi "intuitively, it doesn't feel like a message.  It doesn't sound like a message to me."  At the next ZBA meeting discussing EEEA's appeal and application on June 6, 2013, Ms. Nowak recused herself without explanation.

62.     EEEA timely submitted a Supplemental Memorandum of Law in Support of East End Eruv Association, Inc.'s Appeal and Application for Variances.  The memorandum reiterated that the only issue before the ZBA was "whether a lechi—a PVC strip—is a sign and if the Board [were to decide] that it is, whether EEEA is nonetheless entitled to a favorable ruling on its appeal, or, in the alternative, to a variance."  *See* Supplemental Memorandum of Law, at 5.

63.     On June 6, 2013, the ZBA held the continuation of the public hearing on EEEA's application.  During this meeting, several members of the ZBA were combative and openly

partisan in their questions directed to EEEA.  For example, Chairman Herb Phillips repeatedly asked questions in which he referred to the lechi only as "the sign."  When EEEA's counsel attempted to correct Mr. Phillips' characterization of the lechis as signs by explaining that Mr. Phillips "got that half right," Mr. Phillips insisted, "No, it's all right.  That's what was testified to [at the April 3, 2014 hearing]."  Mr. Phillips, however, mischaracterized testimony from the April 4, 2013 hearing.  Similarly, ZBA member David Reilly interrupted EEEA's counsel to state, incorrectly, that "at the last meeting [] some of the representatives of the Applicant said that the lechi served to alert people to when the wires change direction."  When EEEA's additional counsel attempted to correct him, Mr. Reilly cut him off: "Excuse me, sir.  Excuse me, sir.  That was what was testified to.  And I believe the record will bear me out."  The record, however, does not bear Mr. Reilly out.

64.      Southampton resident Simcha Pollack testified about the severe hardship that his elderly mother-in-law suffers as a result of the lack of an eruv.  ("My wife's mother is an 86[-]year[-]old Holocaust survivor who is not ambulatory.  She's living with us in Westhampton this summer.  On Saturday, … she is effectively a prisoner in her own house.").  No member of the public spoke out at the hearing in opposition to the eruv (with the exception of JPOE's counsel, Mr. Sinnreich).

65.      On July 18, 2013, in response to the ZBA's invitation at the close of the June 6, 2013 hearing to submit supplemental materials, EEEA submitted a letter to the ZBA that reiterated that "[t]he proposed lechis, which are 5/8-inch half-round strips of PVC, do not display a message to the public.  They are simply functional components of an eruv."  The letter also included copies of court decisions that establish the legal basis for EEEA's positions that:  (1) a lechi is not a sign, and (2) the United States Constitution requires the Town's governmental

agencies to reasonably accommodate religious practice of certain Jews by allowing EEEA to attach lechis to Verizon's and LIPA's utility poles pursuant to EEEA's valid licensing agreements with Verizon and LIPA.

66.     On August 1, 2013, the ZBA issued its decision that EEEA was time-barred from appealing the Chief Building Inspector's finding that lechis are signs, and denying EEEA's application for a variance. *See* Aug.1, 2013 ZBA Decision, at 15.  The ZBA made no independent determination as to whether a lechi is a sign under the Town Code, but instead held that the appeal of Chief Building Inspector's finding that lechis are signs was time-barred for failure to initiate the appeal within the sixty days allotted under New York State Town Law § 267-a(5)(b).  *Id.* at 8.

67.     In so doing, the ZBA also failed to consider its obligation to consider the EEEA's application under its original as well as appellate jurisdiction, under Town Code Section 330-166A, which provides that the ZBA "shall have the power by way of original jurisdiction and in passing on appeals where there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter of this chapter to vary or modify the application of the regulations or provisions of this chapter."  Town Code § 330-166A (emphasis supplied).

68.     EEEA presented a case of practical difficulties and unnecessary hardships with respect to its application, and the ZBA was obligated to exercise its original jurisdiction, especially given the governing case law which dictates that reasonable accommodation must be made to allow the free exercise of religion.

69.     Moreover, the ZBA erroneously failed to note that EEEA timely appealed from the Chief Building Inspector's October 25, 2012 denial of sign permits for the lechis, and that such denial failed to explain what restriction the lechis were designed to circumvent under Town

21

Code § 330-203(B)(10), which prohibits "[t]emporary or permanent signs resting on, attached to or inside any vehicles, buildings, fences, telephone poles or any other structures or means of support or otherwise displayed in any manner designed to circumvent the restrictions in this article." Such appeal required the ZBA to reconsider and interpret the code in order to properly review the denial of sign permits.

70.     The ZBA also made an erroneous finding on the evidence in the record by finding that the EEEA sought to "permanently affix signs to telephone poles in the public rights-of-way, which is specifically prohibited under the Town Code, regardless of the presence of the structure (i.e. the telephone pole-which is also specifically prohibited)." Rather, Town Code § 330-210(A) bans signs "placed within the right-of-way lines of a public street." However, there was no proof, either in the building inspector's October 25, 2012 letter, or otherwise recited by the ZBA, that the telephone poles are located in the "right of way lines of a public street."

71.     The ZBA denied EEEA's request for a variance, basing its determination in part on its claims that (i) "the requested variances will alter the essential character of the neighborhood," and that (ii) the unnecessary hardship suffered by the applicants "derives not from the Town's zoning regulations but from Jewish law," which the ZBA described as "motivated by the personal desire of the applicant's members to be freed from the proscriptions of religious law." Ex. A at 13, 14. The ZBA provided no support for these statements or its finding that the lechis would create "clutter." *Id.* at 13. And, contrary to governing law, the ZBA made no attempt to accommodate the free exercise of religious beliefs held by Petitioner's members.

72.     The ZBA determination was also arbitrary and capricious, contrary to law, contrary to and without support in the evidence because it failed to consider applicable potential

22

exemptions for the lechis, for example for religious "flags" pursuant to Town Code § 330-203(A)(4) (exempting "Flags of any other political, civic, philanthropic, educational or religious organization...."). The term "flag" is undefined. The ZBA also failed to consider that religious use of property in the Town is either a permitted or specially permitted use in every zoning district in the Town.

73.     The ZBA determination made several other legally erroneous and arbitrary and capricious findings. For example, it made the baseless finding that granting the requested variance would "create a precedent" for "future applications seeking similar relief." *See* Ex. A, at 13. The ZBA had no evidence that any application seeking similar relief has ever been submitted before, that any other group or individual exists that would desire such relief in the future, or that any harm would come from granting such relief to future applicants. Moreover, the ZBA's statement about creating a "precedent" is undercut by the statement made during the public hearing by a ZBA member that the EEEA had submitted what was "in all respects a unique application."

74.     The ZBA determination admitted that various "signs" exist on poles in Southampton, but arbitrarily determined that these facts were "not persuasive as a basis to exempt the lechis from regulation under the Town Code but instead is a matter for Code Enforcement." The ZBA thus has taken official action that targets certain religious conduct for treatment distinct from the treatment of other religious conduct, or other "signs" that remain attached to utility poles in Southampton. Though EEEA brought the wooden cross to the Town's attention in its supplemental memorandum to the ZBA dated May 17, 2013, the cross remained in the same position until August 1, 2013 (if not later), and then returned to that position as of June 9, 2014 (if not earlier).

WEIL:\95134239\1\99910.3414

75.    The ZBA determination further claimed that the proper standard under which to assess EEEA's variance application was the use variance standard, intentionally adopting a standard which logically had no application to a "use" that had no economic purpose.  The ZBA's application of the use variance standard to EEEA's variance application was thus discriminatory, arbitrary, and capricious.[5]

## V.    THIS PETITION IS TIMELY

76.    Following the ZBA's August 1, 2013 determination, Petitioner renewed its action against the Town of Southampton and the ZBA in the District Court for the Eastern District of New York by filing a separate complaint on August 26, 2013.  *EEEA v. The Town of Southampton and The Town of Southampton Zoning Board of Appeals*, No. 2:13-CV-04810 (E.D.N.Y.), which, among other federal claims, attacked the ZBA's decision as a violation of New York State law.

77.    Southampton and the ZBA moved to dismiss this complaint on January 4, 2014, and on September 24, 2014, the Court dismissed Petitioner's sixth cause of action (asserting that the Court has supplemental subject matter jurisdiction under 28 U.S.C. § 1367) without prejudice and stayed the remainder of the action pending resolution of that sixth cause of action in this state court.

78.    This Petition is timely under CPLR § 205 and 28 U.S.C. 1367.

---

[5] The ZBA Findings and Determinations purport to cite correspondence from the public opposing the eruv in support of its determination, but includes within that list letters *supportive of* the eruv.  *See* Ex. A at 6; *see also* Letter of Irving Ruderman to Southampton ZBA dated July 15, 2013 (writing that he "supports [EEEA's] proposal," and "object[s] to the labeling of this [the eruv] as something Orthodox, which sounds like it is just something for one subgroup").  The ZBA simply ignored other pro-eruv letters submitted by members of the public.

## VI.   VERIZON AND LIPA HAVE REFUSED TO ISSUE LICENSES TO EEEA SOLELY AS THE RESULT OF SOUTHAMPTON'S CONDUCT

79.     To date, Verizon has not issued any licenses to EEEA under either the Eruv Lechi-Stave Agreement or the Pole Attachment Agreement For Miscellaneous Attachments for the attachment of lechis within Southampton.  Likewise, LIPA has not granted any permission to EEEA pursuant to the License Agreement for the attachment of lechis within Southampton.

80.     Verizon and LIPA are ready and willing to issue the required licenses to permit Petitioner to install the lechis necessary to establish an eruv in Southampton, and both have acknowledged that they have no objection to the attachment of lechis to their respective poles.

81.     Both Verizon and LIPA have acknowledged that the only reason why such licenses have not yet been issued is the threatening conduct and actions of the Southampton and the other Municipalities directed to Verizon and LIPA.

82.     Verizon and LIPA have filed a separate action, pending before the United States District Court for the Eastern District of New York, requesting that a declaration be issued to permit Verizon and LIPA to issue licenses for the installation of lechis on utility poles without incurring fines or other sanctions and without liability to Southampton, and an injunction preventing Southampton from interfering in any way with, or otherwise restricting or attempting to restrict, the installation of the lechis.

83.     On June 16, 2014, the United States District Court for the Eastern District of New York determined that "nothing prohibits LIPA or Verizon from entering into contracts to facilitate the attachment of lechis to their utility poles in Westhampton Beach." *See Verizon New York Inc. v. The Vill. of Westhampton Beach*, 2014 WL 2711846, at * 29 (E.D.N.Y. Jun. 16, 2014).

84.     Following the June 16, 2014 Order, Verizon and LIPA each issued licenses for

25

the attachment of lechis to their respective poles in Westhampton Beach, and, as a result an eruv has been established in Westhampton Beach.

85.     As noted above, however, Verizon and LIPA have not issued such licenses for the attachment of lechis to poles in Southampton due to the threat of legal action by Southampton, as well as, implicit in the determination of the Chief Building Inspector and the ZBA described herein.

## FIRST CAUSE OF ACTION

### Request for Relief under Article 78 of the CPLR

86.     Petitioner incorporates by reference the allegations set forth in ¶¶ 1-85 of this Petition as if fully set forth herein.

87.     The ZBA's determination of the EEEA's application was affected by an error of law, was arbitrary and capricious, and was not supported by evidence in the record.

88.     The ZBA's decision was contrary to law and arbitrary and capricious because it contravenes established law:  the United States Constitution requires governments to make reasonable accommodations for religious practice.  The Supreme Court has held that the Constitution does not "require complete separation of church and state; *it affirmatively mandates accommodation*, not merely tolerance, of all religions, and forbids hostility toward any." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984) (emphasis added).

89.     The Second Department unanimously affirmed the constitutionality of eruvin, relying on *Lynch*, among other authorities. *Smith v. Cmty. Bd. No. 14*, 128 Misc. 2d 944 (Sup. Ct. Queens Cty. 1985), *aff'd*, 518 N.Y.S.2d 356 (2d Dep't 1987).  Indeed, the eruv at issue in *Smith* required considerably more accommodations than would be required in Southampton, but the *Smith* court nonetheless concluded that "the actions of the city agencies did not establish religion but were a valid accommodation to religious practice." *Id*. at 947.  Acknowledging that

26

the U.S. Supreme Court mandated that religious practices be accommodated, the *Smith* Court firmly rejected the eruv opponents' arguments: "Plaintiff's argument that the eruv 'enclosed' and 'separated' the area and that the eruv is a 'wall' is simply not true. The eruv is a virtually invisible boundary line indistinguishable from the utility poles and telephone wires in the area." *Id.* at 948. Under the *Smith* precedent, *see supra* footnote 1, the ZBA was required to reasonably accommodate religious practice. The ZBA has utterly failed to do so.

90.     The ZBA relied on a recital of the supposed factual and legal record that was rife with errors and selective omissions in order to conclude that granting Petitioner's application "would create a precedent" for "future applications seeking similar relief." However, the ZBA acknowledged during the hearing that Petitioner's application was "unique."

91.     The ZBA also made the wholly irrational assumption that the lechis interfere with the purpose of the Sign Ordinance, which is designed to promote "the *health, safety and morals or the general welfare of the Town of Southampton.*" The ZBA did not – and indeed could not – explain how the placement of nearly-invisible lechis on fifteen of the Town's utility poles would implicate any legitimate police power or aesthetic concerns.

92.     Further, the ZBA concluded without analytical or evidentiary support that approving Petitioner's tailored and unique request would have rendered the Sign Ordinance "meaningless" in the future, but it failed to point to a single application ever brought to the ZBA similar to that of Petitioner. There was no evidence of any application seeking similar relief, or that any other group or individual exists that would desire such relief in the future, or that any other harm would come from granting such relief.

93.     It was also wholly arbitrary and irrational to deny Petitioner a reasonable accommodation of their religious beliefs when the ZBA possessed original jurisdiction "where

there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter of this chapter to vary or modify the application of the regulations or provisions of this chapter." Town Code § 330-166.

## RELIEF REQUESTED

WHEREFORE, Plaintiff-Petitioner requests that this Court enter an Order:

1.      Annulling and setting aside ZBA's determinations (a) denying Petitioner's appeal from the Southampton Chief Building Inspector's finding that lechis are signs under Southampton Town's Sign Ordinance (Town Code §§ 330-200 *et seq.*) as contrary to law, arbitrary and capricious, and in violation of Petitioner's and its members' constitutional right to the free exercise of their religion, (b) denying Petitioner's application for a variance as contrary to law, arbitrary and capricious, an abuse of discretion, and in violation of Petitioner's and its members' constitutional right to the free exercise of their religion; and (c) failing to exercise its original jurisdiction to determine that the installation of lechis on utility poles owned by Verizon and LIPA was not prohibited by the Town Code;

2.      Directing the ZBA to find that the attachments sought by Petitioner are not signs, or, in the alternative, directing the ZBA to approve the variances sought by Petitioner;

3.      Alternatively, declaring that Southampton Town's zoning code does not prohibit the installation of lechis as sought by Petitioner;

4.      Awarding Petitioner costs and disbursements against Defendants pursuant to CPLR § 8101; and

5.    Granting such other and further relief as the Court deems just and proper.

Dated: Islandia, New York
       October 22, 2014                    BRACKEN MARGOLIN BESUNDER LLP

                                           By:  Linda U. Margolin
                                           *Attorneys for Petitioner*
                                           1050 Old Nichols Road, Suite 200
                                           Islandia, New York 11749
                                           (631) 234- 8585

                                           Robert G. Sugarman
                                           Yehudah L. Buchweitz
                                           WEIL, GOTSHAL & MANGES LLP
                                           767 Fifth Avenue
                                           New York, New York 10153
                                           (212) 310-8000
                                           *Co-Counsel for Petitioner*

WEIL:\95134239\1\99910.3414

VERIFICATION

STATE OF NEW YORK          )
                           ) s.s.
COUNTY OF NEW YORK         )


Pursuant to C.P.L.R. section 3020, MARVIN TENZER, being duly sworn, deposes and says as follows:

    I am the President of Plaintiff-Petitioner East End Eruv Association in the within entitled action.  I have read the foregoing petition and know the contents thereof, and the same are true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe it to be true. The basis of my belief is the books, files and records of the company and documents filed with or by the Town of Southampton and the Town of Southampton Zoning Board of Appeals and their agencies.

    This verification is made by me because the above party is a not-for-profit corporation, and I am the President thereof.

_____
               Marvin Tenzer


Sworn to before me this ____ day
of October, 2014

_____
NOTARY PUBLIC
JOSHUA M. TENZER
Notary Public, State of New York
No. 02TE6254297
Qualified in New York County
Commission Expires _____

# EXHIBIT A

ZONING BOARD OF APPEALS
TOWN OF SOUTHAMPTON
------------------------------------------------------------------------x
In the Matter of the Application of
**East End Eruv Association, Inc.**
National Grid Poles #19-35-P, #20-35-P, #22-40-P, #23-40-P,
 (on Summit Blvd. between Park Street and Glendale Street);
National Grid Pole #30-35-P (on Summit Blvd. between
Glendale Street and Highland Street) National Grid Poles       **DECISION**
#31-40-P, #32-35-P, and #34-35-P (on Summit Blvd.
between Highland Street and Montauk Highway/SR 27A);
National Grid Poles #2099-45-P, #2101.5-40-P (on Montauk
Highway/SR-27A near its intersection with Summit Blvd
and its intersection with Tanners Neck Lane); National Grid
Poles #26-40-P, 27-35-P, #28-35-P (on Tanners Neck Lane
near its intersection with South Country Road); and National
Grid Poles #43-35-P, #44-40-P (located on Tanners Neck
Lane near its terminus at Moriches Bay)
Westhampton, New York
------------------------------------------------------------x

## FINDINGS AND DETERMINATION

Based upon the application, all the documents contained in the Board's file, and
the evidence received at the public hearings, the Zoning Board of Appeals finds and
determines as follows:

Applicant, the East End Eruv Association, Inc. ("EEEA") appeals the
determination of the Chief Building Inspector that a "lechi" is a "sign" pursuant to the
Southampton Town Code; and in the alternative, requests a variance for the placement of
28 lechis on 15 utility poles located in rights-of-way within the Town of Southampton
which is a prohibited use pursuant to Southampton Town Code §330-203(B)(10).
Specifically, lechis are proposed to be located in the hamlet of Westhampton, Town of
Southampton, on National Grid Poles #19-35-P, #20-35-P, #22-40-P, #23-40-P, (on
Summit Blvd. between Park Street and Glendale Street); National Grid Pole #30-35-P (on
Summit Blvd. between Glendale Street and Highland Street) National Grid Poles #31-40-
P, #32-35-P, and #34-35-P (on Summit Blvd. between Highland Street and Montauk
Highway/SR 27A); National Grid Poles #2099-45-P, #2101.5-40-P (on Montauk
Highway/SR-27A near its intersection with Summit Blvd and its intersection with
Tanners Neck Lane); National Grid Poles #26-40-P, #27-35-P, #28-35-P (on Tanners
Neck Lane near its intersection with South Country Road); and National Grid Poles #43-
35-P, #44-40-P (located on Tanners Neck Lane near its terminus at Moriches Bay).

The subject premises is comprised of 15 National Grid utility poles located within
the rights-of-way of various Town-owned roads within the hamlet of Westhampton,
Town of Southampton. Due to the nature of the application, strict compliance with the

posting requirements set forth in Southampton Town Code §330-164 was impossible and as such, at the direction of the Southampton Town Attorney's Office, applicant: (i) posted a sign on the property of an EEEA member located at 21 Bishop Avenue, Westhampton, S.C.T.M. # 900-358-1-18; and (ii) placed a notice of at least 1/16 of a page in both the March 21, 2013, and March 28, 2013, Southampton Press, Western Edition. As the Town Code also requires an applicant to provide written notice by mail to various property owners, applicant mailed notice of the application and public hearing to the property owners abutting and directly opposite (by extension of lot lines through a street or right-of-way) each of the proposed utility poles. Lastly, the Town maintained copies of the locations of the utilities poles in the Southampton Town Clerk's Office for review by the public and also posted such on the Town of Southampton's website.

## SEQRA

This Board found that the action met the criteria for an Unlisted Action and conducted an uncoordinated review. This Board further finds, upon reviewing the information contained in the Environmental Assessment Forms, considering the criteria for determining significance set forth in Section 617.7(c) of the SEQRA Regulations, and upon the recommendation of the Department of Land Management, that the proposed action will not have a significant adverse impact on the environment. As such this Board adopts a Negative Declaration pursuant to the State Environmental Quality Review Act and Chapter 157 of the Southampton Town Code.

## BACKGROUND

By letter dated April 17, 2012, Paul V. Craco, Esq., former attorney for the applicant, requested a determination from Chief Building Inspector Michael Benincasa as to whether the proposed lechis are in fact "signs" within the meaning of Southampton Town Code §330-201. Mr. Benincasa, by letter dated April 27, 2012, responded to Mr. Craco, finding that the lechis are signs and indicating that the EEEA could appeal to the Zoning Board of Appeals ("ZBA") pursuant to Southampton Town Code §330-165. By letter dated July 19, 2012, Michael McCarthy, Esq., attorney for the applicant, requested that Mr. Benincasa "re-examine" this determination, and by letter dated July 30, 2012, the Southampton Town Attorney informed Mr. McCarthy that there is no "re-examination" available pursuant to the Town Code, New York State Town Law or otherwise. On September 14, 2012, the applicant filed 28 sign permit applications with the Town's Building Department for the lechis, which were denied by letter dated October 25, 2012. On October 1, 2012, the ZBA received applicant's appeal from a "non-determination" of the Chief Building Inspector and the determination of his "representative and/or surrogate" which was followed by an application to the ZBA received on December 4, 2012.

## PUBLIC HEARINGS & TESTIMONY

The following testimony was submitted at the hearings as well as in written submissions on this matter:

2

Michael McCarthy, Esq., of McCarthy & Reynolds, P.C., Robert Sugarman, Esq., and Yehudah Buchweitz, Esq., of Weil, Gotshal & Manges, LLP ("counsel") appeared on behalf of EEEA in this matter stating that the applicant is a not-for-profit corporation that seeks to attach lechis to utility poles for the purpose of creating an eruv, a small section of which would be created in the hamlet of Westhampton, Town of Southampton. Counsel explained that an eruv, under Jewish law, is a largely invisible unbroken delineation of an area, which represents an extension of the home that allows observant Jews to leave their homes on Saturdays and other holy days to attend services using or carrying certain items otherwise prohibited by Jewish law such as wheel chairs, car keys and bottled water. Counsel asserted that without such an eruv, many members of the EEEA are unable to observe the Sabbath with their families and friends and are deprived of the opportunity to participate in mandatory communal prayers and observances. Further, eruvin, which are commonplace throughout the metropolitan area as well as the world, would allow the applicant's members to carry keys, prayer shawls and prayer books to the synagogue on the Sabbath. Counsel asserted that the creation of eruvin are so common through the attachment of lechis to telephone poles that "Verizon has a standard form eruv agreement."

Counsel added that the demarcation of the eruv boundary is created by, among other things, attaching wooden strips—or lechis—to certain telephone or utility poles designated by the applicant's religious advisors. Specifically, the EEEA proposes to attach twenty-eight (28) 5/8-inch deep, up to fifteen feet long, half-round strips of PVC (lechis) to fifteen utility poles for the purpose of creating an eruv within the Town. Counsel represented that the lechis will be securely fastened to the utility poles using galvanized common nails and would run from the ground to no closer than 3" from the lowest cable on the pole, and could be painted any color to blend in with the poles, so as to make them unobtrusive and virtually invisible.

Counsel further asserted that despite the Chief Building Inspector's determination, lechis are like "sticks" and certainly not "signs" as are defined by the Southampton Town Code since they (i) do not display a message; (ii) are not intended to display a message; and (iii) are not "used for the purpose of bringing such messages to the attention of the public." Counsel also added that lechis do not consist of any letter, number, figure emblem, picture, outline, character, spectacle, delineation, announcement, trademark, or logo and are not in any way used for the purpose of commercial identification. Similarly, counsel asserted that lechis cannot be considered an outline or delineation because it is the existing overhead utility wires and structures and preexisting natural boundaries—and not the lechis—that outline or delineate the proposed eruv. Instead, counsel explained that the lechis are unobtrusive pieces of plastic that act as a "door that facilitates the creation of the eruv", beyond what the sign ordinance is intended to regulate. In the alternative, however, counsel asserted that the lechis should be treated as an exempt or unregulated sign since the Town of Southampton allegedly does not regulate signs currently existing on these poles, including utility company numbers and other identification signs.

3

With respect to the appeal, counsel asserted that the applicant's appeal of the Building Inspector's determination finding that lechis are signs is not time barred since (i) a denial of the permits to affix the lechis was not issued until October 25, 2012, and such denial is the only action to be appealed under the Town Code; and (ii) the 60 day statute set forth in New York State Town Law is not mandatory and is "really more directory." Mr. McCarthy added that there is no purpose to be served by denying applicant's right to appeal the finding that the lechis are signs.

Counsel went on to assert that if variance relief is required, it is in the nature of an area variance, not a use variance, but that, in any event, applicant is entitled to relief under both standards. Taking into account the area variance standards, Mr. McCarthy summarized that the applicant meets the five part test in that (i) there will be no undesirable change in the character of the neighborhood since the lechis will be nearly invisible, completely unobtrusive, and will only affect the observant Jewish residents who require an eruv; (ii) the rabbinical advisors have determined that the only way to construct the eruv that would encompass portions of the hamlet of Westhampton is by attaching the 28 lechis to the 15 poles; (iii) the request for relief is not substantial considering the lechis are nearly invisible and only attached to 15 poles in a Town with thousands of utility poles; (iv) the lechis will not have any adverse effect or impact on existing physical or environmental conditions as they are nearly invisible to the passerby, placed on existing poles, and would not interfere with the rights-of-way; and (v) the hardship is not self-created since it is a sincerely-held religious belief that is protected by the First Amendment of the Constitution.

With respect to the use variance standards, Mr. McCarthy asserted that (i) the Town is preventing LIPA and Verizon from realizing a full return on the non-utility space of their poles; or in the alternative, that the inability to achieve a financial return is not applicable here; (ii) the hardship is unique since without the lechis, the applicant and its members cannot freely practice their religion and no other segment of the Southampton population requires such lechis-type objects to be affixed to poles in order to accommodate the practice of its religion; (iii) the lechis are nearly invisible and will not alter the character of the neighborhood; and (iv) the hardship is not self-created since the applicant's members are simply seeking to fulfill what they believe to be a "religious obligation."

John Breslin, principal and president of Breslin Appraisal Company testified as a real estate expert on behalf of the applicant and echoed the analysis made by Mr. McCarthy, noting that the lechis are not signs, and that their existence on the utility poles will not change the physical characteristics of the neighborhood nor will they affect property values.

In response to testimony presented in opposition to the application by Jonathan Sinnreich, Esq., discussed more fully here at page 5, counsel submitted that (i) the "eruv" is not an issue before the Board; (ii) counsel for the Jewish People for the Betterment of Westhampton Beach Inc., ("JPOE") mis-quotes from the Shulhan Arukh as the original Hebrew of that work does not define an "eruv;" and (iii) despite assertions to the

4

contrary, the current position of the Reform Movement is expressed in a letter from the Board of Rabbis who are in favor of the construction of an eruv.

In response to questions from the Board, counsel responded that the applicant cannot use fewer lechis or fewer poles as its rabbinical advisors have determined that the only way to establish an eruv that would meet rabbinical standards and encompass portions of the hamlet of Westhampton is as proposed. Additionally counsel maintained that there are no alternatives to the proposed eruv, such as attaching the lechis to private property, as it is specifically the pole, wire and apparatus that are required to establish the eruv. Further, it was presented that there are only certain circumstances, like here, where the lechis are necessary, notwithstanding the fact that there are other eruvin comprised completely of natural boundaries. Mr. Morris Tuchman, Esq. testified that multiple lechis are needed on single poles to create multiple "doors" where the wire is located on the side of the pole and not directly on top, and that very little of this eruv requires the lechis. Marvin L. Tenzer, President of the EEEA, stated that the eruv and the lechis will not interfere with anyone in any way, and will instead, make his life and the lives of the members of the EEEA much easier. Further, Mr. Tenzer stated that the lechi is not a sign and does not convey a message since it merely marks the poles that have wires on them for the eruv association or the rabbi.

Citizens Bernard Schuickman, John Turetsky, Simcha Pollack, Jeffrey Lean, Alan Schechter, and Clint Greenbaum spoke in support of the application, testifying, in sum and substance, that: (i) they have deep religious beliefs; (ii) the erection of the eruv will allow them to spend more time with their family and friends and will enable members to attend synagogue services by permitting them to push wheelchairs and strollers, and carry canes; (iii) there are other religious symbols displayed by the Town on Town property; (iv) they require the eruv in order to practice their religion; (v) they love their community; and (vi) the eruv and the lechis are not signs.

Concerned citizens Monique Attar and Ursula Berlinger testified that they felt there was insufficient notice of the hearing and the application to the public, and wanted more information about the effect of the eruv on the public. Similarly, citizen Kim Vicente appeared in opposition to the application, stating that she had concerns about the notice of the application and hearing to the public and testifying that the lechi is a sign that is creating segregation within the community and will impact the makeup of the community.

Jonathon Sinnreich, Esq., appeared at the public hearings and submitted a "Statement" and Memorandum of Law in Opposition to the application. Mr. Sinnreich explained that JPOE is a not-for-profit corporation that has been in existence since August, 2008 and was formed for the purpose, among others, "of actively opposing governmental assistance and involvement in the erection of an eruv in the Town of Southampton and in the Villages of Westhampton Beach and Quogue." Mr. Sinnreich stated that approximately 300 members of JPOE reside in the Town and the neighboring Villages and communities and are "proud and observant Jews themselves, who belong to major Jewish denominations such as the Reform and Reconstructionist movements,

5

which reject the concept of an *eruv* as a valid interpretation of Jewish law." Mr. Sinnreich asserted that the members of JPOE have a right "not to be confronted on a daily basis as they go about their business in their local neighborhoods by the permanent display on multiple public utility poles of a deeply religious and sectarian symbol of a particular religious belief that they do not share, and in some cases find offensive." In fact, Mr. Sinnreich asserted that his clients would suffer "substantial spiritual injury" if the proposed eruv is permitted.

Specifically with respect to the application, Mr. Sinnreich asserted that the lechis (as is the eruv) are signs since they communicate a message and are also emblems and delineations as set forth in the Town Code. Quoting the Shulhan Arukh, Mr. Sinnreich noted in his testimony and written "Statement", that an eruv has been defined as a "'*symbolical act*' by which an [Orthodox Jewish] religious community is established." As such, Mr. Sinnreich asserted that it is a symbol, conveying a message, as much as a Cross or a Star of David does. As the message relates to JPOE, Mr. Sinnreich stated that the eruv is a "rabbinically-devised ritual system designed to symbolically create and validate the presence of an Orthodox Jewish community within the larger residential community, and to symbolically separate and distinguish that community from the community of non-Jews and so-called 'sinful' Jews, i.e., Jews who do not adhere to Orthodox Jewish practices and observances."[1] The attachment of the lechis to the utility poles, JPOE asserts: (i) demarks the geographic boundaries of the "eruv community;" (ii) serves no secular or governmental purpose; (iii) advances a religious belief; and (iv) would foster excessive governmental entanglement with religion. As such, JPOE asserts that the message conveyed by the eruv is "deeply sectarian," and thus, violates the Establishment Clause of the First Amendment to the United States Constitution and has no place on public utility poles within the Town's rights- of-way.

This Board is in receipt of a letter from the Suffolk County Department of Planning dated April 15, 2013, finding that the matter is one for local determination and noting "[t]he Commission does not review or render determination regarding the interpretation of the Town's own Code." Also received is a letter dated January 8, 2013, from LIPA Manager Christopher Braglia, stating "[d]ue to the EEEA's ongoing dispute with the applicable municipalities, LIPA has not invoked Article VII Section 2 of the License Agreement and is prepared to perform under the terms specified in the License Agreement dated July 27, 2010."

Correspondence was received from the following individuals in opposition to the application: Lauren Culver Barlow, Christopher J. Eldin, Julia Barlow, James Barlow, Ursula Berlinger, Homer Stafford Bryant, Ethelle Fountain, Hallock and Vivian Culver, Daniel Culver, Gail Clyma, Joan Edlin, Sara Sinclair, Derik Sinclair, Jackie Sprotte and Irving Ruderman. These comments, in sum and substance, stated that (i) the application should be denied as it favors one religious group; (ii) the eruv will have a negative impact on the neighborhood-particularly as it relates to property values; (iii) the lechis are signs; and (iv) the approval of the application would violate the U.S. Constitution. These documents are maintained as a part of the record.

---

[1] May 17, 2013, Memorandum of Law in Opposition by Jonathon Sinnreich, paragraph 5, page 2.

## INTRODUCTION

This application is one of first impression for the Board, requiring it to evaluate and/or balance a host of issues and competing legal doctrines. Among them are:

1. the jurisdictional extent of the 60 day time period set forth in the New York State Town Law to appeal the building inspector's interpretation that a lechi is a "sign";

2. whether the applicant's request mandates the application of the area or use variance standards set-forth in the Town Law;

3. whether this Board has authority to grant variances permitting a private religious entity to utilize poles in the public rights of way in a manner prohibited by the Town's sign ordinance;

4. the extent to which this Board, given the religious nature of the applicant's request, must accommodate same even if the applicant cannot, for theological reasons, accept any modifications to its application;

5. the Constitutional ramifications of granting or denying the application and the extent to which this Board may legally consider the competing doctrinal claims of the applicant and JPOE.

The Board notes that there are pending in the Eastern District of New York cases between the applicant and the villages of Quogue and Westhampton Beach involving the issues of whether LIPA and Verizon have the legal authority to authorize the use of the public rights-of-way for the affixation of lechis without municipal approval and whether, under their franchise agreements, they may enter sub-license agreements similar to those presented to this Board by the applicant.[2]

The Board further notes that each of the 15 utility poles to which the applicant seeks to affix its lechis is located in a public right-of-way within the Town. Pursuant to §64 (3) of Town Law, the Town is entrusted with the "management, custody and control of all town lands, buildings and property of the town" and is required "to keep them in good repair." Town Law §64(7) gives to the Town the authority to grant "rights, franchises, permissions or consents for the use of the streets, highways, and public places or any part thereof or the space above or under them or any of them, for any specific purpose authorized by law upon such terms and conditions as it may deem proper and as may be permitted by law." Such public rights-of-way are reserved for the use and convenience of

---

[2] This Board also notes that the utility poles in question appear to be owned by National Grid yet the franchise agreement for such poles is with LIPA.

7

the public and may not be infringed upon.[3] It is the Board's understanding that each of Verizon and LIPA has been granted a franchise to maintain its poles in the Town's rights-of-way.

## APPEAL OF THE BUILDING INSPECTOR'S DETERMINATION THAT THE LECHIS ARE SIGNS IS NOT TIMELY

While applicant seeks to appeal the determination made by the Chief Building Inspector finding that lechis are signs, the time for an appeal has long since passed.[4] With respect to board of appeals' procedure, New York State Town Law §267-a (5)(b) states, in relevant part:

> Filing of administrative decision and time of appeal. (b) An appeal shall be taken within sixty days after the filing of any order, requirement, decision, interpretation or determination of the administrative official, by filing with such administrative official and with the board of appeals a notice of appeal, specifying the grounds thereof and the relief sought. The administrative official from whom the appeal is taken shall forthwith transmit to the board of appeals all the papers constituting the record upon which the action appealed from was taken.

Contrary to EEEA's position, New York courts have repeatedly found that the sixty day time frame to appeal such a determination is jurisdictional unless the appellant neither knew, nor should have known, of the issuance of the permit or determination to be appealed.[5] Here, applicant knew immediately of the determination since it was e-mailed to its counsel on April 27, 2012. Further, receipt of the determination was anticipated by the EEEA as it was made in response to a request for an interpretation from the applicant's counsel dated April 17, 2012, and indeed, counsel for the Town informed counsel for the EEEA of the 60 day time period in a letter dated March 28, 2012.

Despite all of this, applicant failed to timely appeal this interpretation and instead attempted to cure this jurisdictional defect by requesting—three months later—that, the Building Inspector "re-examine" his determination, and then "appealing" the July 30, 2012, responsive letter from the Town Attorney. This attempt is flawed in two respects:

---

[3] For example, given the paramount interests of the public therein, title to municipal rights of way may not be infringed upon or lost by adverse possession (Driggs v. Phillips, 103 N.Y. 77 (1886); Fordham Operating Corp. v. County of Westchester, 82 Misc.2d 566 (Sup. Ct. Westchester Cty. 1975), aff'd 51 A.D.2d 1014 (2d Dep't. 1976) and no lapse of time may operate to deprive the public of its right to remove encroachments therefrom. New York v. De Peyster, 120 A.D. 762 (1st Dep't. 1907), aff'd 190 N.Y. 547 (1907).
[4] Applicant filed a Notice of Appeal on October 1, 2012, five months after the April 27, 2012, determination that the lechis are signs.
[5] The decision in Clark v. Town of Sand Lake Zoning Board of Appeals, 52 A.D. 3d 997 (2008), app. den. 11 N.Y. 3d 707 (2008) confirms that knowledge of the issuance of a determination is necessary to start the running of the appeal period, and addresses issues of fairness for neighbors who may not have known of the determination made until construction commences or the like.

(i) the Town Attorney is not authorized to interpret the Town Code;[6] and (ii) any finding made, even one by the Building Inspector reiterating the prior interpretation, does not reset the time from which to appeal.[7] The cases cited by applicant in support of its contention that the 60 day time limit is not jurisdictional are not persuasive.[8]

Counsel for the applicant also asserts that the Chief Building Inspector does not have authority to issue a "stand alone" interpretation, claiming that his authority to issue interpretations that are subject to review by this board is "grounded in" the Town Code. Specifically, counsel asserts that Town Code §330-165 authorizes the Zoning Board of Appeals to entertain appeals of administrative determinations only where the official involved had refused to issue a permit. As such, applicant asserts that the sole determination that could be appealed is the Building Department's October 25, 2012, denial of the sign permit.

This exclusive reliance on Town Code §330-165 is misguided as the Building Inspector's authority is broad, both under various other provisions of the Town Code and also pursuant to New York State Town Law, granting him/her not only the authority to issue interpretations but also to administer the laws and ordinances of the Town. Reading the Town Code and the Town Law together, the power of this Board to hear and determine appeals of interpretations of the Building Inspector is not limited to Town Code §330-165. On the contrary, §330-163 of the Town Code provides that the ZBA shall have "all powers and duties prescribed *by law* and this chapter." And more importantly, New York State Town Law §267-b specifically permits boards of appeal to reverse, affirm or modify "interpretations," and to issue such interpretations as it feels should have been made. Thus, under Town Law §267-b, this Board had jurisdiction to review Mr. Benincasa's April 27, 2012, determination, *whether or not it related to a subsequent denial of a sign permit.* Contrary to applicant's position, the Building Inspector had authority to render his interpretation and this Board had jurisdiction to review it had EEEA timely appealed.

---

[6] The Honorable Leonard D. Wexler, in his Order dated November 3, 2011, when discussing the issue of ripeness noted that "[t]he Town attorney's determination and the supervisor's email are not decisions of the 'Town' on the issue, because enforcement of the Sign Ordinance lies with Southampton's Building Department and ZBA."

[7] The Court of Appeals in Palm Management Corp. v. Goldstein, 8 NY 3d 337, 341 (2007), determined that "[t]he mere repetition, in words or substance, of an authorization contained in the old certificate of occupancy should not be treated as a newly appealable 'order, requirement, decision, interpretation, or determination."

[8] In Matter of Anayati v. Board of Zoning Appeals of Town of North Hempstead, 65 A.D.3d 681 (2d Dep't. 2009), the Court specifically noted that the issue of the 60 day statute was not before it. In Commissioner of Community Development of City of Rochester v. Cohen, 115 A.D.2d 177 (4th Dep't. 1985), the extension of time granted by the court dealt only with a City of Rochester code provision dealing with non-conforming uses. And in Schultz v. Town of Red Hook Zoning Board of Appeals, 293 A.D.2d 621 (2d Dep't. 2002), the Court characterized the 60 day time period as a "limitations period". Even if this Board were to adopt the reasoning in Schultz that the time limitation should not be applied if, under the circumstances, it would be "unfair" to do so, it is hard to see any unfairness here given the facts noted above.

Lastly, applicant asserts that it is the Town's fault that the application was not made timely since the Chief Building Inspector and the Town's litigation counsel "incorrectly" outlined the administrative procedure for the applicant when they were told that they could simultaneously appeal the interpretation and alternatively seek relief from this Board.[9]  This outlining of the procedure of course was explicitly predicated on the assumption that the appeal would be made timely to this Board.  If the appeal had been timely brought, the applicant could have asserted that the Chief Building Inspector erred in his determination that the lechis were signs—and if the Board agreed with that determination, the applicant could then have sought relief from the prohibition relating to signs on telephone poles and Town rights-of-way.    Instead, applicant, without explanation, failed to timely appeal, is bound by the determination that the lechis are signs and was required to make sign permit applications to the Town.  Applicant's own failure to comply with New York State Town Law has rendered that portion of its appeal that relates to the Building Inspector's interpretation of the sign ordinance untimely and therefore unsuccessful.

## REQUEST FOR RELIEF FOR THE PROPOSED 28 SIGNS

### The Lechis are not "exempt" signs under Town Code §330-203

Counsel for the applicant, without reference to the exemption provisions of Town Code §330-203(A), asserts that in the event the lechis are considered "signs," they should be exempted from the ban on prohibited signs as the Town does not enforce this provision strictly.  To this end, counsel submitted photographs, the majority of which indicated wires and numbers placed on the poles by the utilities, and also including a photograph showing a "Yard Sale" sign and another of a wooden cross nailed to the base of a pole between two rocks.  This evidence is not persuasive as a basis to exempt the lechis from regulation under the Town Code but instead is a matter for Code Enforcement.[10]

---

[9] This assertion is patently false.  In fact, by letter dated March 28, 2012, Special Counsel to the Town reminded Paul Craco, Esq., (counsel to the applicant) that despite the testimony of the Chief Building Inspector during litigation that a lechi was a sign, applicant would have to request a letter for an interpretation in order to appeal such to the ZBA.  This letter specifically read that "Section 267-a(6) requires that an appeal of such interpretation be filed within 60 days of the filing of the Chief Building Inspector's interpretation made pursuant to 267-a(5)."  This letter was followed by the April 13, 2012, letter from the Town's Special Counsel, to Mr. Craco, again reminding him of the procedure "[i]n the event you will be seeking to appeal the building inspector's determination and seeking a variance from the Sign Law, such timely applications may be submitted simultaneously to the Zoning Board of Appeals."

[10] Indeed, this Board notes that (i) items affixed to poles by the utility companies could be categorized as necessary to facilitate telecommunications pursuant to their franchise agreements; and (ii) Judge Wexler notes in his Order that "the evidence here does not demonstrate that the Town tacitly or expressly allowed exemptions, whether for religious or secular purposes, from the Sign Ordinance.  Specifically, plaintiffs presented only six locations with signs on the 593 miles of public roads and thousands of utility poles in Southampton, despite Greenbaum's two years of photographing."

Standard of Review

This Board recognizes the uniqueness of this application, respects the deep religious beliefs of the community seeking the requested relief, and appreciates the importance of applying the correct standard of review. This Board frequently hears requests to vary provisions of the Town Code as they relate to signs and has used the area variance standard when the applications fit the definition of an "area variance" pursuant to New York State Town Law §267(1)(b), which states that such requests are for the "authorization by the zoning board of appeals for the use of the land *in a manner which is not allowed by the dimensional or physical requirements of the applicable zoning regulations*." (emph. suppl.). Specifically, these applicants who, crucially, are the property owners, seek relief to reduce setbacks or increase the permitted size of a sign. Likewise, this Board has entertained applications for use variances falling within the definition set forth in New York State Town Law §267(1)(a) as an "authorization by the zoning board of appeals for the use of land *for a purpose which is otherwise not allowed or is prohibited by the applicable zoning regulations*." (emph. suppl.) These applicants, again, the property owners, requested permission for a use which is not permitted in the zoning district—such as, for example, to construct a house in a Residential Waterfront district, or establish a commercial use in a residential district.

Likewise, this Board recognizes that reasonable accommodations should and oftentimes, must be considered in applications where a religious organization seeks relief from zoning provisions, and this Board in fact, has heard such applications, and granted such relief, but again, these were instances where the religious organization was the property owner.[11] Here, however, applicant is requesting relief to erect 28 permanent signs (i) on 15 telephone poles which is prohibited under Town Code §330-203B(10); and (ii) in the Town's rights-of-way which is prohibited under Town Code §330-210. This application is made even more unique in that while other locations for signs are prohibited under Town Code §330-203B (gates, fences, roofs) here, the applicant is neither the physical property owner (the rights-of-way are owned by the Town), nor the owner of the telephone pole. As such, this Board finds the request to affix lechis/signs to telephone poles within the Town's rights-of-way to be a use variance. Specifically, this Board finds that since the prohibition of the affixation of the lechis/signs is *not* the result of the application of any *dimensional or physical requirements of the Sign Ordinance* but rather of the *prohibition* against their use, any request to do so is necessarily in the form of a use variance.

Applicant contends that the use variance standard does not apply to the application because, by definition, use variances relate to an authorization for *a use of land* as opposed to the use of *structures* affixed to land such as the poles at issue here.

---

[11] In fact, the case law that confirms the rebuttable presumption that educational and religious uses are always in furtherance of the public health, safety and morals, have the church/educational institution as both the applicant and the property owner. See. Cornell Univ. v. Bagnardi, 68 N.Y.2d 583 (1986); Matter of Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Zoning Bd. of Appeals of Town/Village of Harrison, 296 A.D.2d 460 (2d Dep't. 2002).

11

This Board disagrees. Applicant is not seeking relief to affix lechis to its roof, gate, or other structures on its own property or the property of its members. Instead, applicant is seeking relief to permanently affix signs to telephone poles in the public rights-of-way, which is specifically prohibited under the Town Code, regardless of the presence of the structure (i.e. the telephone pole-which is also specifically prohibited). This Board finds that the analysis would be the same were applicant seeking to affix the lechis directly to the pavement of the Town rights-of-way. In fact, were this the case, the request would be akin to a billboard sign, which the Town Code similarly prohibits, and case law confirms is a use variance.[12] This Board finds that the choice of the standard to be applied to a given application has nothing to do with whether or not it relates to the use of a structure. Rather, the choice relates to whether the application involves a request to vary *dimensional* standards applicable to a *permitted* use (thereby triggering an area variance standard) or to allowing a *use* otherwise *prohibited* by the applicable ordinance (thereby triggering a use variance standard).[13]

<u>Use Variance Analysis</u>

As noted in the 2012 Supplementary Practice Commentaries by Terry Rice, "[t]he demonstration necessary to obtain a use variance relief is specific and rigorous because a use variance authorizes the permanent use of a property that is contrary to those permitted by a town's zoning scheme and law."[14] In fact, New York State Town Law §267-b(2)(b), states that "[n]o such use variance shall be granted by a board of appeals without a showing by the applicant that applicable zoning regulations and restrictions have caused unnecessary hardship." Further, and in order to prove such unnecessary hardship, the applicant must demonstrate that for each and every permitted use under the Town Code for the Zoning District:

a)  The applicant cannot realize a reasonable return, provided that lack of return is substantial as demonstrated by competent financial evidence;
b)  That the alleged hardship relating to the property in question is unique and does not apply to a substantial portion of the district or neighborhood;
c)  That the requested use variance, if granted, will not alter the essential character of the neighborhood; and
d)  That the alleged hardship has not been self-created.

In addition to meeting each of aforementioned prongs of the use variance test, New York State Town Law requires that the Board ". . . grant the minimum variance that it shall deem necessary and adequate to address the unnecessary hardship proven by the

---

[12] <u>See, e.g.</u>, <u>Kodogiannis v. Zoning Board of Appeals of the Town Malta</u> 42 A.D.3d 739 (3d Dep't. 2007); <u>Mazurkiewicz v. Zoning Board of Appeals of the City of Saratoga Springs</u> 159 A.D.2d 892 (3d Dep't. 1990)
[13] In fact, the courts do not seem to have made such a distinction. For example, in <u>Consolidated Edison Co. v. Hoffman</u>, 43 N.Y, 2d 598 (1978), the Court of Appeals approved the application of use variance standards to Con Ed's application to construct a 565 foot cooling tower in the Village of Buchanan.
[14] New York State Town Law Section 267-b, Supplementary Practice Commentaries at p. 163.

applicant, and at the same time preserve and protect the character of the neighborhood and the health, safety and welfare of the community."

Here, applicant has submitted very little in the record to establish that it is entitled to 28 use variances for the placement of the lechis on 15 utility poles in the Town rights-of-way. In fact, applicant has even asserted that the first prong of the test is inapplicable and irrelevant, despite the fact that the statute requires a showing for each element. Further, applicant has erroneously submitted its own plight with respect to addressing uniqueness in that it is their religious beliefs that make the application unique, whereas it is actually the uniqueness of the land itself that is required to be analyzed, not the uniqueness of the applicant. Applicant's failure to establish unnecessary hardship with respect to these factors is sufficient for this Board to deny the request for the use variances. Nevertheless, this Board also finds that the applicant has failed to meet the other requirements set forth in New York State Law.

Specifically, this Board finds that the requested variances will alter the essential character of the neighborhood. While applicant asserts that the lechis might be designed so as to have little to no visual impact on the telephone poles, this Board recognizes that the impact in granting 28 use variances will render meaningless two provisions of the Town Code which specifically prohibit signs on telephone poles and only permit signs erected by a governmental agency within the rights-of-way. The granting of such relief will also be in direct conflict with the purposes and intent of the Article XXII of the Town Code (Signs) which include, among other things: (i) reducing clutter and distracting signage to promote the free flow of traffic and public safety; and (ii) assuring "that public benefits derived from expenditures of public funds for the improvement and beautification of streets, and other public structures and spaces are protected by exercising reasonable controls over the character and design of sign structures." This legislation not only exempts various signs from regulation, but also, as aforementioned, prohibits specific locations of signs as they are not compatible with the Town Board's zoning without exception.

Moreover, the magnitude of the variances requested by the applicant precludes this Board from granting the requested relief. Each of the 15 poles and 28 lechis is to be located in the rights-of-way throughout the Town. New York courts have long warned zoning boards against, *in their quasi-judicial capacities*, permitting deviations from zoning codes that are so widespread as to constitute de facto amendments thereof, amendments which only the town or village board *in their legislative capacities may enact*.[15] The granting of the requested relief on the scale and in the locations requested by the applicant would amount to a de facto amendment of the Town's sign ordinance and constitute an impermissible abnegation by this board of the clearly enunciated purposes of the Town Board when it enacted same almost 9 years ago. It would also create a precedent that would have to be dealt with by this Board in connection with future applications seeking similar relief, potentially resulting in even further erosion of the purposes of the sign ordinance.

---

[15] See, e.g. Cohalan v. Schermerhorn, 77 Misc. 2d 23 (Sup. Ct. Suff. Cty. 1973); Avis Serv. v. Mondello, 193 A.D.2d 599 (2d Dep't. 1993).

Further, the record reveals that the inability of observant Jews to bring certain objects to synagogue or to carry items for other purposes on the Sabbath and other holy days derives not from the Town's zoning regulations but from Jewish law.[16] It further establishes that the relief requested is motivated by the personal desire of the applicant's members to be freed from the proscriptions of religious law by securing a variance of secular law (the Town's Sign Ordinance). Such motivation, however, is a matter personal to the applicant that, under New York law, cannot constitute the "unnecessary hardship" redressable by a zoning board through its variance powers.[17]

Lastly, applicant has failed to demonstrate either a lack of reasonable return or a unique hardship. When addressing the use variance standards, the applicant is required to demonstrate by competent financial evidence that it cannot realize a reasonable return from each of the uses permitted in the applicable zone. Here, the "applicable zone" is the Town's rights-of-way, from which applicant has no right to realize any return. Further, to the extent that the utilities (as opposed to the applicant) could assert a loss of reasonable return from the sub-licensing of the poles located in the Town's rights-of-way as applicant briefly asserts, even were such sub-licenses permissible, there was no competent financial evidence submitted to support such an assertion. Not only was this conclusion based solely upon the applicant's opinion of the return, but said opinions comprised the entire analysis of this prong of the test. Additionally, a review of the License Agreement with LIPA reveals a nominal $5 fee per attachment, per pole, per year. Similarly, applicant has failed to demonstrate that the alleged hardship is in fact unique to the property and does not apply to a substantial portion of the district or neighborhood. This analysis requires a "uniqueness" of the property, and not of the owner, an analysis which remains glaringly absent from the record.

The Board is aware of the constitutional dimensions of the issues presented and extensively addressed by the applicant and JPOE. It is aware that the grant or denial of the requested variances could, in the mind of an informed observer familiar with the facts, create the perception that the Board has acceded to the religious convictions of one denomination of Judaism over another. However, in view of the jurisdictional limitations on this Board imposed by §267-b(2)(b) of the Town Law as strictly construed by the courts and the admonition of the courts forbidding the intrusion of government into inter-denominational disputes, the Board makes no findings with regard to the Establishment and Free Exercise clause contentions of the parties.

The applicant contends and the Board agrees that religious uses enjoy a preferred status under New York law as well as a presumption that they are in furtherance of the public health, safety and welfare. While this presumption cannot be a substitute for an applicant's demonstrated satisfaction of the use variance standards set forth in Town

[16] See Transcript, p. 19, 1-2.
[17] See, e.g., Fuhst v. Foley, 45 N.Y.2d 441 (1978); Wisnom v. Zoning Board of Appeals, 168 A.D.2d 921(2d Dep't. 1990); Montalbano v. Silva, 204 A.D.2d 457 (2d Dep't. 1994); Cohen v. Silva, 228 A.D.2d 593 (2d Dep't. 1996).

14

Law, religious uses are nonetheless to be accommodated by a zoning board so long as doing so will not have an adverse over-all impact on the public's welfare.[18]

As noted above however, the applicant has failed to demonstrate the necessary hardship required to permit this Board to issue use variances for the affixation of the lechis. Moreover, given the applicant's position that it cannot accept any alternative to the number or location of the lechis it has requested, the only "accommodation" available to the Board is a wholesale grant of the application. Given the facts that (i) the lechis are to be attached to utility poles located in the public rights-of-way throughout the Town, (ii) the applicant has not demonstrated that the applicable franchise agreements give LIPA the right to grant sub-licenses to use the poles for non-utility purposes, and (iii) the lechis constitute illegal signs under the Town's Sign Ordinance, this Board cannot accommodate the application as doing so would have an over-all adverse impact on the public welfare.

<u>CONCLUSION</u>

Therefore, in the interests of justice and for the reasons set forth herein, this Board (i) finds that the appeal made challenging the Chief Building Inspector's determination that lechis are signs is not timely, and thus, not before this Board; and (ii) denies applicant's request for use variances permitting the affixation of 28 signs to 15 utility poles within the Town's rights-of-way.

**Dated: August 1, 2013**

ADAM GROSSMAN

---

[18] See, e.g., <u>Cornell University v. Bagnardi</u>, <u>supra</u>;  <u>Matter of Tabernacle of Victory Pentecostal Church v. Weiss</u>, 101 A.D.3d 738 (2d Dep't. 2012)

# EXHIBIT B

LECHI EXAMPLE



Lowest cable

3" below

### EXHIBIT 1

### ERUV SPECIFICATIONS

1. The lechi is made from 5/8" half-round, black, thin-walled plastic molding. The molding is flexible and easily cut.

2. The lechi will run from the ground to no closer than 3" from the lowest cable on the pole.

3. Each lechi, at the cable end, will be capped with a white rubber or plastic tip.

4. Each lechi will be securely fastened to the pole using galvanized common nails.

5. When a rope is to be strung between poles to complete the ERUV's perimiter, a 1/4" nylon rope, of contrasting color to black, must be used. The rope's attachment to each pole must have a clearance of at least 12" above the telephone cable attachment. The rope and construction plans must be approved, in advance, by Verizon.

# EXHIBIT C



Pole #1:  44-40-P



Pole #2:   43-35-P



Pole #3:  28-35-P



Pole #4:  27-35-P



Pole #5:  26-40-P



Pole #6:   2099-45-P



Pole #7:   2101.5-40-P



Pole #8:   34-35-P



Pole #9:  32-35-P



Pole #10: 31-40-P





Pole #12:   23-40-P

Pole #13:  22-40-P [first angle]





Pole #13:   22-40-P [second angle]



Pole #14:   20-35-P



Pole #15:  19-35-P